**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission, | ) CV 06-502-PHX-JAT |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| iBIZ Technology Corp., et al. | ) |
| Defendants. | ) |

Pending before the Court is Plaintiff Security and Exchange Commission's (the "SEC") Motion for Summary Judgment Against Elliott and McRoberts (Doc. #70). The Court now rules on the motion.

**I.      INTRODUCTION**

The SEC has sued iBIZ Technology Corp. ("iBIZ"), an Arizona-based company that provided accessories for hand-held electronics, the executives of iBIZ, and three others who allegedly sold shares of iBIZ. It has filed a motion for summary judgment against Defendants Elliott and McRoberts. The SEC argues that on the undisputed facts, Defendants Elliott and McRoberts violated Section 5 of the Securities Act, 15 U.S.C. §§77e(a) & 77e(c), by selling or participating in the sale of unregistered securities. The SEC asks that the following be entered against Defendants Elliott and McRoberts: permanent injunctions, disgorgement, civil penalties, and penny stock bars.

## II.    BACKGROUND

This case involves an alleged penny stock fraud executed by iBIZ and defendants Kenneth Schilling, CEO of iBIZ, and H. Mark Perkins, executive vice president of iBIZ. The SEC contends that from July 2003 through May 2004, iBIZ, Schilling, and Perkins made false and misleading statements in press releases, online interviews, investor correspondence, proxy solicitations, and annual and quarterly reports filed with the SEC regarding iBIZ's licensing rights to a development-state product called the "Virtual Keyboard." And that as a result the stock price of iBIZ's shares rose from less than $.005 per share to as high as $.06 per share. Schilling and Perkins allegedly took advantage of this inflated stock price by selling over $1 million of their personal iBIZ shares.

The SEC further alleges that during this period, iBIZ, Schilling, and Perkins used certain underwriters, including Defendants Elliott and McRoberts, to make illegal sales of their stock to the public to raise much needed capital. The SEC argues that Mr. Elliott offered and sold 182,353,941 shares of unregistered iBIZ stock over a two-year period, thereby generating trading proceeds of over $1.2 million. Mr. Elliott allegedly remitted some of these proceeds to iBiz as a means of injecting capital into the struggling company.

Mr. McRoberts allegedly facilitated the sale of 25,000,000 shares of unregistered iBIZ stock issued to Defendant Jeffrey Firestone.[1] According to the SEC, Mr. McRoberts offered the shares to two buyers, and facilitated the closing of the sales. The sales generated proceeds of $46,475 for Mr. Firestone, and payment of $4,165 in fees to Mr. McRoberts. The SEC claims that Mr. McRoberts later arranged the issuance and unregistered resale of an additional 50,000,000 iBIZ shares. Mr. McRoberts generated proceeds of $404,077 through his alleged participation in that group of sales. Mr. McRoberts transferred some of those proceeds to a third party, allegedly to pay operating expenses of iBIZ.

---

[1] Because Mr. Firestone has failed to appear in this action, the Court entered default judgment against him.

**III.   ANALYSIS AND CONCLUSION**

<u>Standard</u>

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is mandated, "...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247-48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

<u>Section 5 Liability</u>

Sections 5(a) and (c) of the Securities Act, 15 U.S.C. §§77e(a) & (c), prohibit the unregistered offer or sale of securities in interstate commerce. *Anderson v. Aurotek*, 774 F.2d 927, 929 (9th Cir. 1985). "By its terms, Section 5 of the 1933 Act creates liability for any securities sale" not properly registered; "it does not limit liability to initial distribution." *SEC*

1 *v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007)(internal citations omitted).  Each sale of a security
2 must either be made pursuant to a registration statement or be exempt from registration.  *Id.*
3 (quoting *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998)).

4       The SEC establishes a prima facie case for a Section 5 violation by showing: (1) the
5 defendant offered or sold securities; (2) no registration statement was in effect or filed with
6 the SEC as to such securities; and (3) interstate transportation or communication or the mails
7 were used in connection with the offer or sale.  *Berckeley Inv. Group, Ltd. v. Colkitt*, 455
8 F.3d 195, 212 (3d Cir. 2006).  But Section 5 liability does not attach if the securities are
9 exempt from registration as a private offering under section 4(2), 15 U.S.C. §77d(2), or if the
10 offeror or seller is not an issuer, underwriter or dealer, section 4(1), 15 U.S.C. §77d(1).
11 *S.E.C. v. Murphy*, 626 F.2d 633, 640 (9th Cir. 1980).  The defendant has the burden of
12 demonstrating that an exemption applies to the sale.  *SEC v. Ralston Purina Co.*, 346 U.S.
13 119, 126 (1953).

14     <u>Form S-8</u>

15       Form S-8 is an abbreviated registration statement that companies can use to register
16 shares the company offers or sells to its employees or consultants, provided they are natural
17 persons, provide bona fide services to the company, and are not involved in capital raising
18 transactions.  General Instructions to Form S-8, C.1(b).  Companies can use Form S-8 only
19 to issue stock as compensation for consultants for bona fide services not connected with
20 capital raising.  *See* 17 C.F.R. §239.16b(a)(1) (stating that a Form S-8 may be used to register
21 securities "to be offered to its employees . . . under any employee benefit plan."); 17 C.F.R.
22 §230. 405 (stating that a consultant may participate in an employee benefit plan only if . . .
23 [t]hey provide bona fide services to the registrant and . . . [t]he services are not in connection
24 with the offer or sale of securities in a capital-raising transaction, and do not directly or
25 indirectly promote or maintain a market of the registrant's securities.").

26       Companies cannot use consultants who receive S-8 stock as conduits to the public
27 market.  *Phan*, 500 F.3d at 903.  They cannot misuse Form S-8 to "circumvent the
28 registration requirement by devious and sundry means."  *North Am. Research and Dev.*

- 4 -

1  *Corp.*, 424 F.2d 63, 71 (2d Cir. 1970). Once a company has sold a security to an employee
2  or consultant pursuant to a Form S-8 registration statement, the Form S-8 does not cover
3  subsequent sales by the employee or consultant. *Phan*, 500 F.3d at 903-04. To register an
4  employee or consultant's resale of shares on Form S-8: the company must include a re-offer
5  prospectus with its filing on Form S-8; the restricted shares must be acquired by the selling
6  shareholder prior to the filing of the registration statement, and the reselling shareholder must
7  be named in the filed re-offer prospectus. Form S-8 General Instructions, C.1(b) and 3(b).

8  <u>Defendant Elliott</u>

9  Mr. Elliott had a consulting agreement with iBIZ. He received iBIZ stock and stock
10 options as compensation for his consulting services. Mr. Elliott exercised his first stock
11 options on December 10, 2003, when he purchased 85,000,000 shares. According to Mr.
12 Elliott, he sold those shares in several transactions between December 11, 2003 and
13 December 2004. The SEC argues he had sold all of those shares by December 15, 2003.

14 Mr. Elliott exercised additional options in March and April of 2004. On March 17,
15 2004, iBIZ issued 7,352,941 shares to him. He sold those shares by March 23, 2004. iBIZ
16 issued another 15,000,000 shares to Mr. Elliott on April 12, 2004. He sold those shares by
17 April 16, 2004. Mr. Elliott gave iBIZ a promissory note for those shares, which he paid off
18 in several payments.

19 Mr. Elliott exercised his last options on December 6, 2004. iBIZ issued him
20 75,000,000 shares. He again gave iBIZ a promissory note for the 75,000,000 shares. He had
21 sold the shares by December 10, 2004.

22 iBIZ registered the shares it sold to Mr. Elliott pursuant to a Form S-8. iBIZ issued
23 him the shares pursuant to their consulting agreement. The consulting agreement provided
24 that iBIZ would issue him free trading securities. Although iBIZ's registration statement
25 covered the sale to Mr. Elliott, no registration statement covered Mr. Elliott's resale of the
26 shares. iBIZ did include a re-offer prospectus with one of its amended statements, but this
27 re-offer prospectus did not list Mr. Elliott and his shares.

28 A Form S-8 registration statement covers the sale of securities to the consultant, but

1 not the subsequent sales by the consultant. *Phan*, 500 F.3d at 903-04.   Each sale of a security must either be made pursuant to a registration statement or be exempt from registration. *Id*. at 902.  Because iBIZ did not file a re-offer prospectus for Mr. Elliott's sales, no registration statement covered his resales.

Mr. Elliott argues that he relied on his agreement with iBIZ that he would receive unrestricted shares.  He believed when he re-sold the shares that they were free trading.  But Mr. Elliott's belief does not matter.  The SEC does not have to prove scienter.  Section 5 imposes strict liability on sellers of unregistered securities. *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980)(internal citations omitted).  The SEC can prove a prima facie Section 5 case regardless of whether the seller knew he was violating the registration requirements. *Id*.

No registration statement covered Mr. Elliott's resales of the shares received pursuant to the consulting agreement.  The SEC therefore has met its prima facie burden as a matter of law.  But that conclusion does not end the Court's inquiry.

The Court must determine whether Mr. Elliott has created an issue of material fact regarding an exemption for his sales under Section 4(1) of the Securities Act.  Section 4(1) exempts transactions by any person other than an issuer, underwriter, or dealer from the registration requirements of Section 5.  15 U.S.C. §77d(1).  The SEC argues that this exemption does not apply because Mr. Elliott acted as an underwriter when he sold his iBIZ shares.[2]  Section 2(a)(11) of the Securities Act defines "underwriter" as:

> [A]ny person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person

---

[2]Although Mr. Elliott addresses these terms in his opposition brief, the SEC does not argue for the purposes of the pending motion that he was an issuer or a dealer.

> directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

15 U.S.C.A. § 77b(a)(11).

The SEC states, without citation, that the following factors are relevant to determining whether a person acted as an underwriter: whether the shares were acquired by the potential issuer for investment purposes; the number of shares; the length of time the individual held the securities; whether there was an unforeseeable change in circumstances of the holder preceding the sales, and whether the individual was participating, directly or indirectly, in the distribution of securities or rasing capital for the issuer. The SEC contends that Mr. Elliott's immediate resales of his iBIZ stock demonstrates that he purchased the stock with "a view to distribution." The SEC further argues that he participated in a distribution of iBIZ stock because he was an "affiliate" of iBIZ, defined in relevant part as "a person that directly, or indirectly . . . controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. §230.144.

Mr. Elliott, citing *In re Scattered Corp. Sec. Litig.*, 844 F.Supp. 416 (N.D. Ill. 1994), argues that his sale of a large amount of securities does not necessarily make him an underwriter. He also contends, citing *KDI Corp. v. Former Shareholders of Labtron*, 536 F.2d 1146 (6th Cir.), that whether he acted as an underwriter is a factual question dependent on a number of factors, including his intent in selling the securities.

Mr. Elliott argues that the number of shares he sold was small in comparison to the amount of shares outstanding and the amount of shares registered by the Form S-8. He also claims that the sales were isolated and spread out in time. He maintains that he controlled the timing of the sales and the amount of the sales, not iBIZ. And he did not exercise all of his options for various reasons and did not exercise the ones he did under any pressure from iBIZ.

Although a close call, viewing the facts in a light most favorable to Mr. Elliott, the Court cannot say as a matter of law that he acted as an underwriter in his resale of iBIZ stock. The Court finds that disputed issues remain as to whether Mr. Elliott purchased his stocks

with a view to distribution and if he in fact participated in a distribution. The fact finder should resolve those issues. The Court therefore denies the SEC's motion for summary judgment against Defendant Elliott.

Defendant McRoberts

The SEC claims that Mr. McRoberts facilitated two sales of securities owned by Defendant Firestone. Mr. Firestone sold a total of 36,691,177 shares to two buyers – Equity Speculations Group, L.P. and Sprout Investments. The SEC argues that Mr. McRoberts offered the shares to the two buyers, negotiated the purchase prices paid for the shares, and made arrangements for the closing of the transactions. The two sales resulted in $46,475 of stock sale proceeds. No registration statement covered the sales of the shares.

Mr. McRoberts claims he played an insignificant role in the sale of securities to Equity Speculations and Sprout Investments. He argues that he did not organize, orchestrate, negotiate, or otherwise play a significant role in the sale of Mr. Firestone's stock. Rather, he called an associate of his, Paul Enright, about Mr. Firestone's desire to sell his stock. Mr. Enright then identified Equity Speculations as a buyer and negotiated that sale. And Mr. McRoberts only provided Mr. Brovarone, the lawyer who prepared the stock purchase agreement, with a general outline for the transaction once the parties had agreed to the deal; transmitted to Mr. Brovarone the wiring instructions for Mr. Firestone; and transmitted to Mr. Brovarone the stock purchase agreement once Mr. Firestone signed it.

Mr. McRoberts states that he had even less to do with Mr. Firestone's sale of shares to Sprout Investments. He claims to have almost no recollection of the sale. He remembers only confirming with Mr. Brovarone that Mr. Brovarone would act as the escrow agent for the sale and confirming with Mr. Brovarone the writing instructions to Mr. Firestone.

The SEC also claims that in October of 2003, Mr. McRoberts orchestrated the resale of 50,000,000 shares that iBIZ had issued to his assistant under Form S-8 for services

- 8 -

partially performed by Mr. McRoberts.[3]  The SEC argues that Mr. McRoberts directed his assistant to resell the stock into the public market, directed the timing and prices for such sales, and received sales proceeds of $404,077.  And it argues that no registration statement covered the resale.  Further, Mr. McRoberts allegedly transferred $320,043 of the stock proceeds to a third party to pay an iBIZ business expense.

Mr. McRoberts maintains that the shares issued to his associate, Dan Voykin, were validly registered under Form S-8 because the shares were compensation for non-capital raising activities.  At the time of the iBIZ issuance, Mr. McRoberts was providing consulting services to companies.  He enlisted Dan Voykin to help him in that endeavor.

Defendant Schilling and Mr. McRoberts reached an agreement under which Mr. McRoberts would provide marketing services for iBIZ's products in return for 50,000,000 iBIZ shares.  The initial agreement listed Mr. McRoberts as the consultant, but the final, signed agreement listed Mr. Voykin as the consultant.  Mr. McRoberts asserts that the shares were compensation to his consulting business,[4] in which he and Mr. Voykin both participated.

Mr. McRoberts asserts that he originally intended to hold the issued shares, but decided to sell them when a strong market developed.  Mr. McRoberts admits that he assisted Mr. Voykin in the sale of the stock, and that Mr. Voykin transferred the proceeds of the sale to him.  Mr. McRoberts then re-transferred $9000 to Mr. Voykin as compensation.  Mr. McRoberts used most of the remaining funds to prepare a mailer advertising iBIZ's product, and retained a portion as his compensation.

---

[3]The SEC claims that registration of the shares on a Form S-8 was improper because the shares were issued as compensation for capital formation activities.

[4]Shares registered under Form S-8 must be issued to an individual, as opposed to an entity.

A.    Firestone Sales

As stated earlier, the SEC establishes a prima facie case for a Section 5 violation by showing: (1) the defendant offered or sold securities; (2) no registration statement was in effect or filed with the SEC as to such securities; and (3) interstate transportation or communication or the mails were used in connection with the offer or sale. *Berckeley*, 455 F.3d at 212.  Mr. McRoberts argues that the SEC has not proven as a matter of law that he "offered or sold" securities.

Because the shares were issued to Mr. Firestone, not Mr. McRoberts, the SEC must prove that he was both a necessary participant and a substantial factor in the sale of Mr. Firestone's stock. *Phan*, 500 F.3d at 906.  Mr. McRoberts argues that he played a minimal role in the sale to Equity Speculations and had even less to do with the sale to Sprout Investments.  He claims that his involvement in the sale to Equity Speculations virtually ended once he contacted Mr. Enright, who found a buyer, about Mr. Firestone's desire to sell his stock. And Mr. McRoberts claims his role in the Sprout Investments sale was limited to confirming that Mr. Brovarone would act as escrow agent and confirming wiring instructions.

The Court finds that Mr. McRoberts has created a material issue of fact regarding the level of his involvement in the sale of Mr. Firestone's stock.  The Court cannot say that no reasonable juror could find that Mr. McRoberts played a less than substantial role in the sale of the stock. Because the Court holds that the SEC has not met its prima facie burden, it will not address the exemption arguments regarding the Firestone sales.

B.    Voykin Sales

Mr. McRoberts does not dispute that he played a substantial role in the resale of the stock issued to his associate, Mr. Voykin. He admits that he "assisted Mr. Voykin in the sale of [the] stock." (Doc. #85, p. 11). Nor does he dispute that he used interstate communication for the sale.  Finally, because the SEC has demonstrated that no registration statement

- 10 -

covered the resale of the S-8 shares, the SEC has proven its prima facie case as a matter of law.

Mr. McRoberts nonetheless argues that Section 4(1) exempted the resale from registration. Section 4(1) exempts sales of securities by persons other than issuers, underwriters, and dealers from the Section 5 registration requirements. 15 U.S.C. §77d(1). Mr. McRoberts argues that he did not act as a conduit for the sale of iBIZ securities to the public. He maintains that he originally intended to hold the shares, and therefore did not take the stock with a "view to a distribution." He contends that he received the shares as compensation for legitimate consulting services and not as part of an effort to raise capital for iBIZ.

The SEC argues that the Voykin sales were not exempt under Section 4(1) because he was either an underwriter or an affiliate of iBIZ. It contends that Mr. McRoberts was an underwriter because he did in fact act as a conduit for sales to the public. The SEC further argues that he was an affiliate of iBIZ because he was under its control. The SEC claims that the consulting agreement evidences this control. The agreement provides that "all final decisions on consultation, advice, and services rendered by the Consultant to the Company shall rest exclusively with the Company." (Plaintiff's Ex. 57, p. iB5519). The SEC also notes that Mr. McRoberts and Mr. Voykin sold the shares within a week of delivery.

The parties materially disagree about whether Mr. McRoberts acted as a conduit to the public in order to raise money for iBIZ. Mr. McRoberts argues he legitimately used a portion of the proceeds to pay for an advertising mailer for iBIZ because his production of the mailer fell under his consulting duties. He claims that his business received the shares in lieu of cash, and that he certainly could have used a cash payment to fulfill his obligations under the consulting agreement.

The Court finds that material issues of fact remain regarding whether Mr. McRoberts took the Voykin shares with a view to a distribution to the public or whether he took the shares as just compensation and used a portion of the proceeds to fulfill his obligations.

Viewing the disputed facts in the light most favorable to Mr. McRoberts, as it must, *Ellison*, 357 F.3d at 1075, the Court cannot say as a matter of law that Mr. McRoberts acted as an underwriter. Similarly, the Court cannot find as a matter of law that Mr. McRoberts was controlled in the stock sales based on the language of the consulting agreement. iBIZ's control over one aspect of the relationship does not indicate control over all aspects. Because the Court has determined that reasonable jurors could disagree on whether Mr. McRoberts was an underwriter or affiliate of iBIZ, and therefore whether the Section 4(1) exemption applies, the Court must deny the SEC's motion for summary judgment with regard to the Voykin sales.

Conclusion

In summary, the SEC has demonstrated as a matter of law that Defendant Elliott sold unregistered securities using interstate commerce, but fact issues regarding his status as an underwriter remain in dispute. The SEC has not demonstrated as a matter of law that Defendant McRoberts played a substantial role in the resale of the Firestone stock, and therefore has not met its burden on the first element for Section 5 liability. Finally, while the SEC has shown as a matter of law that Defendant McRoberts substantially participated in the sale of the Voykin stock using interstate mails without a valid registration statement, it has not demonstrated as a matter of law that Section 4(1) did not exempt the resale from the registration requirements.

Accordingly,

IT IS ORDERED DENYING Plaintiff SEC's Motion for Summary Judgment Against Elliott and McRoberts (Doc. #70).

DATED this 21st day of July, 2008.

James A. Teilborg
United States District Judge