**WO**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

SECURITIES AND EXCHANGE ) No. 2:06-CV-0502-PHX-JAT
COMMISSION, )
)
              Plaintiff, )
)
        vs. ) FINAL PRETRIAL  ORDER
)
IBIZ TECHNOLOGY CORP., )
KENNETH W. SCHILLING, )
H. MARK PERKINS, )
JEFFREY S. FIRESTONE, )
D. SCOTT ELLIOTT, AND )
JERROLD B. MCROBERTS, )
)
              Defendants. )

        The following is the joint Final Pretrial Order considered at the Final Pretrial

Conference on February 23, 2009 at 11:00 a.m.

A.      COUNSEL FOR THE PARTIES
        **Plaintiff**:      Leslie J. Hughes      (303) 844-1086      HughesLJ@sec.gov
                          Barbara T. Wells      (303) 844-1005      WellsB@sec.gov
                          Securities and Exchange Commission
                          1801 California Street, Suite 1500
                          Denver, Colorado 80202-2656
                          Main telephone: (303) 844-1000 and fax: (303) 844-1068
        **Defendants**:

        Counsel for iBiz Technology Corporation, Kenneth Schilling and H. Mark Perkins
                          John E. Karow, Esq.
                          Law Office of John E. Karow
                          11350 North 104th Place

Scottsdale, AZ 85359
Email: jeklaw@cox.net
Telephone: (480) 391-2236 and fax: (480) 391-0132

Counsel for Defendant D. Scott Elliott
Thomas D. Birge
Birge & Minckley, P.C.
9055 East Mineral Circle, Suite 110
Centennial, CO 80112-3457
Email: tbirge@birgeminckley.com
Telephone: (303) 860-7341 and fax: (303) 860-7338

Counsel for Defendant Jerrold B. McRoberts:
David A. Zisser
Isaacson Rosenbaum P.C.
633 17th Street, Suite 2200
Denver, CO 80202
Email: dzisser@ir-law.com
Telephone: (303) 256-3952 and fax (303) 292-3152

B.      STATEMENT OF JURISDICTION.

        1.      The Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v (a), and Sections 21(e) and 27 of the

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u (e) and 78aa.

        2.      Jurisdiction is not disputed.

C.      STIPULATED AND UNCONTESTED FACTS AND LAW.

        1.      **The following facts are admitted by the parties and require no proof**:

                a.      **General Information about the Parties.**

*1.*      In connection with the transactions, acts, practices, and courses of business

at issue, the defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce, of the mails, or of the means and

instruments of transportation or communication in interstate commerce.

*2.*      iBiz Technology Corporation ("iBiz" or the "company") is a Florida

corporation which had its principal place of business in Phoenix, Arizona.

*3.*      The company registered its common stock with the Commission pursuant to

Section 12(g) of the Exchange Act since 1999.  From the spring of 2003 through

the end of 2004, the prices of offers to buy iBiz stock were quoted on the Over-

The-Counter Bulletin Board.  Exhibit 145.

*4.* The company was obligated to file annual and quarterly reports with the Securities and Exchange Commission. iBiz Technology, Schilling and Perkins joint Answer ("iBiz Answer") ¶ 13.

*5.* The common stock of iBiz was a penny stock because the shares of the company were sold at prices of less than $5.00 per share during the time periods alleged in the Complaint. Exhibit 145.

*6.* iBiz Technology began incurring losses in 2000. iBiz Answer ¶19.

*7.* The fiscal year for iBiz ends on October 31 of each year. iBiz reported that it had 45,000,097 common shares outstanding and held by its shareholders on October 31, 2002. Exhibit 139, Form 10-K 2002 at p. 24.

*8.* During times relevant to this case, iBiz operated a wholly owned subsidiary under the name iBiz, Inc. Exhibit 145.

*9.* Kenneth W. Schilling has been the president, chief executive officer, and director of iBiz since at least 1999. At the time of the conduct alleged in the Complaint, he lived in Phoenix, Arizona.

*10.* Mark Perkins has been the executive vice president of iBiz and a director of the company since 1999. At the time of the conduct alleged in the Complaint, he lived in Phoenix, Arizona.

*11.* D. Scott Elliott lives in Ana Maria Island, Florida.

*12.* Jerrold B. McRoberts lives in Santa Fe, New Mexico.

*13.* Mr. Schilling gave sworn testimony in the Commission's investigation of this matter on September 30, and October 1, 2004, and on February 8 and 9, 2005.

*14.* Mark Perkins gave sworn testimony in the Commission's investigation of this matter on October 28, and 29, 2004, and February 9, and 10, 2005.

*15.* On May 11, 2005, Mr. Elliott gave sworn testimony in the Commission's investigation in this matter.

*16.* On September 24, 2007, Mr. McRoberts gave sworn testimony during a deposition in this case.

*17.*     On September 9, 2007, Daniel Voykin gave sworn testimony during a deposition in this case.

   **b.     iBiz's, Schilling's and Perkins' Activities Related to the Virtual Keyboard**

*18.*     In June 2003, Schilling met with Endeavour Capital, AG ("Endeavour") in Israel and proposed that Endeavour consider transferring its Virtual Keyboard license to the a prospective iBiz spin-off company, iBiz Inc. in exchange for Endeavour obtaining control of the spin-off company.  In early July 2003, Endeavour's chief executive officer emailed Schilling a preliminary term sheet for the transaction.  iBiz Answer ¶ 22 and 23.

*19.*     On July 23, 2003, iBiz Technology and Schilling issued a press release stating the iBiz Technology had entered into "a definitive agreement to acquire the assets of [Endeavour]."  Exhibit 196.

*20.*     Following additional negotiations in late July 2003, Schilling and Endeavour tentatively agreed that Endeavour would transfer the Virtual Keyboard license to the spin-off company in exchange for 11,200,000 of the 13,440,000 shares to be issued by the new company.  iBiz Answer ¶ 27.

*21.*     On or about July 29, 2003, Schilling and Endeavour signed a revised term sheet.  This two and a half page document stated that it was a "term sheet" specifying "basic terms and conditions" and that any final agreement on the terms was "subject to . . .  the completion and execution of mutually acceptable definitive agreements."  The term sheet stated that Endeavour will assign the worldwide production and marketing license for the Virtual Keyboard to the new spin-off company, not to iBiz Technology.  The term sheet did not contain any terms which gave iBiz Technology the right to distribute the Virtual Keyboard or benefit from sales of the Virtual Keyboard in any way. iBiz Answer ¶ 28.

*22.*     On August 22 and September 12, 2003, iBiz Technology, at the direction of its Board of Directors, who were Schilling and Perkins, filed preliminary and definitive proxy statements soliciting shareholder approval to spin-off its

subsidiary.  On September 12 and September 22, 2003, iBiz Technology at the direction of its Board of Directors, who were Schilling and Perkins, filed preliminary and definitive information statements that stated the company had received shareholder approval for the spin-off.  iBiz Answer ¶ 30.

*23.*    Schilling reviewed and approved these four proxy and information statement filings.  iBiz Answer ¶ 31.

*24.*    In December 2003, iBiz Technology, Schilling, and Perkins initiated a publicity campaign regarding the Virtual Keyboard.  From December 30, 2003 through the end of February 2004, iBiz Technology, Schilling and Perkins issued at least ten press releases that referred to the product as the "iBIZ Technology Virtual Keyboard" or, in one case, as iBiz Technology's "latest creation."  Several of these releases linked iBiz Technology's financial success to the success of the keyboard by asserting, for instance, that demand for the Virtual Keyboard would "result in significant increases in [iBiz Technology's] revenues and earnings."  iBiz Answer ¶ 33.

*25.*    Schilling and Perkins knew that no definitive agreement had been signed as of December 2003.  iBiz Answer ¶ 35.

*26.*    During January 2004, Schilling also provided two online interviews regarding iBiz Technology and the Virtual Keyboard. During the second interview, which began with the interviewer welcoming Schilling as the CEO of "iBIZ Tech Corp., trading symbol IBZT on the OTCBB exchange," Schilling asserted that the market for the Virtual Keyboard was "enormous" and "the largest market I've ever had a product address," that "we're about ready to deliver the product to the consumer," and that "this company has the ability to reach sales milestones we have not seen in the past as a result of [the Virtual Keyboard]."  Schilling did not mention Endeavour or the spinoff company in the interview.  iBiz Answer ¶ 36.

*27.*    By October 2003, Schilling and Perkins knew that Endeavour's license to the Virtual Keyboard was non-exclusive and that another license had been granted to a large manufacturing conglomerate headquartered in Hong Kong.  iBiz Answer ¶ 38.

*28.*      In an October 17, 2003 email to Schilling, Endeavour stated that its license was "not exclusive" and noted that the patent holder had issued another license to this Hong Kong licensee.  Schilling forwarded the email to Perkins.  iBiz Answer ¶ 39.

*29.*      On January 8, 2004, iBiz Technology, Schilling and Perkins issued a press release that "announced today that its Virtual Laser Keyboard is now shipping." Exhibit 204.

*30.*      On January 13, 2004, Schilling gave an interview with CEOcast in which he stated, "The virtual keyboard's intellectual property is protected via US patents and it's held by a company in Jerusalem, Israel by the name of VKB.  We do [have] an exclusive licensing agreement for that  technology to imbed it into our accessory device and, moving forward, we'll continue to enhance that exclusivity and either it will be through an outright buyout of the technology or a much broader relationship with that type of company."  Exhibit 209.

*31.*      In early January 2004, iBiz Technology's stock price reached a high of $0.06.  iBiz Technology's stock traded above $0.04 for several weeks thereafter, and above $0.03 through early May 2004.  iBiz Answer ¶ 51.

*32.*      On February 19, 2004, Perkins sent an email to Ed Lewis that stated "VKB in Israel owns the patents to the technology used inside of our keyboard. We have an exclusive worldwide agreement to market that technology.  The Virtual Keyboard is owned by iBIZ."  Exhibit 265.

*33.*      On May 3, 2004, iBiz Technology and Schilling issued a press release that stated "The much anticipated Virtual Laser Keyboard [is] now in stock" and "ready for shipping."   On this date, iBiz received a shipment of Virtual Keyboards from the factory.   iBiz Answer ¶ 48.

*34.*      On June 15, 2004, iBiz Technology announced "recent information" indicating that Endeavour would not ship anymore keyboards. The company's stock price fell more than 30 percent and closed below $0.01.  iBiz Answer ¶ 54.

*35.*     Over the next several months, as it became clear that iBiz Technology would not meaningfully benefit from the Virtual Keyboard, the company's stock price continued to fall, ultimately settling in the $0.003-$0.005 range, returning to where it stood in early December 2003 before Schilling and Perkins began their publicity campaign regarding the keyboard. iBiz Answer ¶ 55.

*36.*     In June 2004, Schilling and Perkins directed iBiz Technology to offer, sell and deliver 10 million shares to Firestone. iBiz Answer ¶ 78.

     **c.**     **iBiz Registration Statements**

*37.*     Between March 14, 2003 and December 31, 2004, iBiz filed five registration statements with the Securities and Exchange Commission to register the sales of iBiz securities: a Form SB-2 registration on March 14, 2003 ("Form SB-2"); a Form S-8 registration on June 13, 2003 (June Form S-8"); a Form S-8 registration on July 24, 2003 ("July Form S-8"); a Form S-8 registration on October 30, 2003 ("October Form S-8"); and a Form S-8 registration on April 19, 2004 (April Form S-8"). Exhibit 96.

*38.*     iBiz also filed two amendments to the Form SB-2 registration statement on March 14, and May 7, 2003.  The second amendment to Form SB-2 registered for resale 874,565,216 shares by three shareholders: AJW Partners, LLC; AJW Offshore, Ltd.; and AJW Qualified Partners, LLC.  The second amendment to the Form SB-2 does not list Elliott as a selling shareholder whose shares are registered for resale. Exhibit 116.

*39.*     The June Form S-8 registration statement registered for resale 67,740,459 shares held by eleven shareholders as part of the 2003-A Stock Plan and Compensation Agreement.  The June Form S-8 contains a reoffer prospectus, but it does not list Elliott as a selling shareholder whose resales are registered by this Form S-8. Exhibit 118.

*40.*     The July Form S-8 registration statement registered for sale 50,000,000 shares by iBiz as part of the Company's Non-Employee Directors and Consultants Retainer Stock Plan. The July Form S-8 does not contain a reoffer prospectus and

does not list Elliott as a selling shareholder whose shares are registered for resale. Exhibit 119.

*41.*    The October Form S-8 registration statement registered for sale 22,000,000 shares by iBiz as part of its 2003 Stock Incentive Plan.  The October Form S-8 does not contain a reoffer prospectus and does not list Elliott as a shareholder whose resale are registered by this Form S-8. Exhibit 97.

*42.*    iBiz also filed two amendments to its October Form S-8 registration statement.  Amendment No. 1 to the October Form S-8 registration statement was filed on December 8, 2003 ("December Form S-8") to register an additional 450,000,000 shares by iBiz under the company's 2003 Stock Incentive Plan.  The December Form S-8 does not contain a reoffer prospectus and does not list Elliott as a selling shareholder whose shares are registered for resale. Exhibit 98.

*43.*    Amendment No. 2 to the October Form S-8 registration statement was filed on January 30, 2004 ("January Form S-8") to register for resale 30,000,000 shares owned by Schilling and 30,000,000 shares owned by Perkins.  Exhibit 105.

*44.*    The January Form S-8 contains a reoffer prospectus that lists Schilling and Perkins as the reselling shareholders.  The January Form S-8 reoffer prospectus does not list Elliott as a selling shareholder whose shares are registered for resale. Exhibit 105.

*45.*    The April Form S-8 registration statement registered for sale 200,000,000 shares by iBiz as part of the company's Stock Incentive Plan. The April Form S-8 does not contain a reoffer prospectus and does not list Elliott as a selling shareholder whose shares are registered for resale.  Exhibit 106.

*46.*    The April Form S-8 registration statement was filed on April 19, 2004 after iBiz had issued the 22,352,941 shares to Elliott on March 17, and April 12, 2004, and after Elliott had sold these shares.

*47.*    Although Schilling's letter directing to the transfer agent to issue the 75,000,000 shares to Elliott indicates the company's transaction is covered by the

December Form S-8 and the April Form S-8, these registration statements only sought to register the initial offer and sale by iBiz.  Exhibit 108.

*48.*      Both the December Form S-8 and the April Form S-8 were filed before the 75,000,000 shares were issued to Elliott on December 6, 2004. Exhibits 98 and 106.

*49.*      The December Form S-8 and the April Form S-8 do not contain reoffer prospectuses and do not list Elliott as a shareholder whose shares are registered for resale.  Exhibits 98 and 106.

        **d.**      **Elliott December 2003 Sales**

*50.*      iBiz filed an Amended Form S-8 registration statement on December 8, 2003 ("December Form S-8 registration statement") to register the company's sales of an additional 450,000,000 shares to its consultants under the company's 2003 Stock Incentive Plan.  Exhibit 98.

*51.*      The December Form S-8 registration statement does not contain a reoffer prospectus and does not list Elliott as a selling shareholder whose sales of iBiz shares are registered.  Exhibit 98.

*52.*      On December 9, 2003, Schilling sent instructions by fax to iBiz's transfer agent located in Utah, Interwest Stock Transfer, directing it to issue 25,000,000 shares to Elliott and to issue an additional 25,000,000 shares, but not to deliver them to Elliott until receipt of further instructions.  Schilling stated in the letter that the stock certificates should be issued without restrictive legend "[p]ursuant to the Amended S-8 Registration, filed December 8, 2003."  Exhibit 63.

*53.*      On December 10, 2003, Schilling sent a second letter by fax to iBiz's transfer agent, Interwest Stock Transfer, directing it to issue an additional 60,000,000 shares to Elliott.  Schilling stated in the letter that the stock certificates should be issued without restrictive legend "[p]ursuant to the Amended S-8 Registration, filed December 8, 2003."    Exhibit 63.

*54.*     On December 10, 2003, Interwest Stock Transfer sent stock certificate number 4457 for 60,000,000 shares and stock certificate number 4453 for 25,000,000 shares to Elliott at his address in Florida.  Exhibit 63.

*55.*     On or about December 11, 2003, Elliott offered and sold the 60,000,000 iBiz shares to Sprout Investments LLC for $96,720.  The brokerage account statement of Sprout Investments LLC at WestPark Capital, Inc. shows the receipt of 60,000,000 shares of iBiz stock on December 12, 2003.  Exhibit 92.

*56.*     On December 12, 2003, Elliott offered and sold an additional 18,375,000 iBiz shares through his brokerage account at West Park Capital, Inc. for $40,864.80.  Exhibit 95.

*57.*     On December 15, 2003, Elliott offered and sold an additional 6,625,000 iBiz shares through his brokerage account at West Park Capital, Inc. for $15,556.30.  Exhibit 95.

### e.     Elliott's March and April 2004 Sales

*58.*     Schilling directed the transfer agent to issue the 7,352,941 shares to Elliott without legend, pursuant to the December Form S-8 registration statement.  Exhibit 100.

*59.*     On March 22, 2004, Elliott offered and sold 3,377,941 iBiz shares through his brokerage account with WestPark Capital, Inc. for $125,801.53.  Exhibit 101.

*60.*     On March 23, 2004, Elliott offered and sold 3,975,000 iBiz shares through his brokerage account with WestPark Capital, Inc. for $137,917.24.  Exhibit 101

*61.*     On April 12, 2004, Schilling directed Interwest Transfer, its transfer agent, to issue the 15,000,000 shares to Elliott without a restrictive legend, pursuant to the Form S-8 registration that was amended on December 8, 2003.  Exhibit 102.

*62.*     The December Form S-8 registration statement did not contain a reoffer prospectus and did not list Elliott as a selling shareholder whose shares are registered for resale.  Exhibit 98.

*63.* On April 14, 2004, Elliott offered and sold 3,000,000 iBiz shares through his brokerage account with WestPark Capital, Inc. for $100,039.61.  Exhibit 101.

*64.* On April 15, 2004, Elliott offered and sold 7,000,000 iBiz shares through his brokerage account with WestPark Capital, Inc. for net proceeds of $219,325.36. Exhibit 101.

*65.* On April 16, 2004, Elliott offered and sold 5,000,000 iBiz shares through his brokerage account with WestPark Capital, Inc. for net proceeds of $153,538.33. Exhibit 101.

### f.      Elliott's December 2004 Sales

*66.* On December 6, 2004, Schilling directed the transfer agent to issue the 75,000,000 shares to Elliott without legend, pursuant to the Form S-8 registration amended December 8, 2003, and the Form S-8 registration dated April 19, 2004. Exhibit 108.

*67.* The December Form S-8 registration statement does not contain a reoffer prospectus and does not list Elliott as a selling shareholder whose shares are registered for resale.  Exhibit 98.

*68.* On April 19, 2004, iBiz filed a Form S-8 registration statement to register its sale of 200,000,000 shares under its 2004 Stock Incentive Plan (April Form S-8 registration statement").  The April Form S-8 registration statement does not contain a reoffer prospectus.  It does not list Elliott as a selling shareholder whose shares are registered for resale. Exhibit 106.

*69.* Between December 7, and 10, 2004, Elliott offered and sold the 75,000,000 iBiz shares in a series of six transactions. Exhibit 112.

*70.* Elliott received $388,423 from the sale of the 75,000,000 iBiz shares. Exhibit 112.

*71.* Elliott sent wire transfers of $15,000 to iBiz on December 6, 2004, $200,000 on December 16, 2004 and $78,000 on December 21, 2004. Exhibit 91.

*72.*     As discussed above in paragraphs 78, 79 and 80, between December 2003 and December 2004, Elliott offered and sold 182,352,941 iBiz shares for which he received $1,273,187.41.  Elliott transferred at least $593,600 to iBiz Inc. Exhibit 290.

**g.     McRoberts' Activities**

*73.*     On August 18, 2003, iBiz, Schilling, and Perkins offered and sold 36,691,177 shares to Jeffrey Firestone.  Exhibits 26 and 231.

*74.*     Firestone and iBiz prepared a draft consulting agreement dated August 20, 2003, in which Firestone agreed to provide consulting services to the company in exchange for an undetermined number of shares of iBiz common stock.  Exhibit 237.

*75.*     In August 2003, McRoberts participated in an effort to find a purchaser for a block of iBiz shares issued to Firestone.  McRoberts Answer ¶ 57.

*76.*     In August 2003, Firestone made arrangement with McRoberts to offer and sell 20,000,000 iBiz shares for approximately $39,500.  McRoberts Answer ¶ 62.

*77.*     In August 2003, McRoberts called Paul Enright ("Enright"), told him that Mr. Firestone was looking for a friendly buyer for Firestone's shares, and asked if Enright could help Mr. Firestone, which he did.

*78.*     On August 17, 2003, Firestone sent McRoberts and Schilling an email directing them to send part of the money from Firestone's stock sales directly to the Chinese manufacturer of one of iBiz's products.  Exhibit 78.

*79.*     On August 21, 2003, Firestone agreed with McRoberts to compensate him by paying ten percent of the monies to be paid from the sale of Firestone's iBiz shares to Eldorado Capital.  Exhibit 25.

*80.*     McRoberts is a member of Eldorado Capital LLC, a New Mexico limited liability company that he formed in approximately 2001.  McRoberts uses Eldorado Capital to transact business.

*81.*    On August 21, 2003, McRoberts emailed Brovarone wire transfer instructions for payment of his 10 point commission to Eldorado Capital LLC. Exhibit 4

*82.*    Mr. McRoberts was not involved in negotiating the transaction whereby Mr. Firestone sold his shares.  McRoberts Tr., pp. 44: 2-45: 8; 47: 9-15; 47: 17-21; Bogani Tr., pp. 12: 21-13: 4; 15: 1-8.

*83.*    Equity Speculation Group LLC is an entity used by Mark Bogani to make investments in stocks and real estate.  Bogani Tr., p. 8:1-7.

*84.*    In 2003, the sole business of Equity Speculation Group was buying and selling securities.  Bogani Tr., p. 13:12-17.

*85.*    Mr. Bogani had been a licensed securities broker and has owned a stock transfer company since 2005.  Bogani Tr., pp. 7: 3-14; 35:8-18.

*86.*    Dennis Brovarone, a Denver lawyer, was appointed as the escrow agent to handle the sales of Mr. Firestone's stock.  Brovarone Tr., pp. 8: 12-9:2.

*87.*    Mr. Brovarone had provided legal services for Equity Speculation Group. Brovarone Tr., p. 13: 17-22.

*88.*    Other than acting as an escrow agent in the transactions in which Mr. Firestone sold stock, Mr. Brovarone had no business dealings with Mr. McRoberts. Brovarone Tr., p. 12: 7-10

*89.*    Mr. Brovarone believed that Mr. Enright may have asked him to act as escrow agent in transactions where Mr. Firestone sold shares of iBiz Technology stock.  Brovarone Tr., p. 8: 16-20.

*90.*    Mr. Brovarone believes he had telephone conversations with Mr. Firestone. Brovarone Tr., pp. 15: 21-16: 2.

*91.*    Mr. Firestone communicated directly with Mr. Brovarone to advise him of the closing price of iBiz Technology's stock in order to complete the sale of stock from Mr. Firestone to Equity Speculation Group.  Brovarone Tr., pp. 38: 14-39:9.

*92.*     Mr. Bogani was informed by Mr. Enright that shares of iBiz Technology were available.  Bogani Tr., p. 9: 9-21.

*93.*     Mr. Enright understood that Mr. Bogani was interested in transactions involving a large amount of shares where the transaction was done outside the market at a negotiated price constituting a discount to the market price.  Enright Tr., pp. 88: 22-89:3.

*94.*     Mr. Bogani had dealt with Mr. Brovarone prior to the purchase of iBiz Technology shares from Mr. Firestone.  Bogani Tr., p. 10:15-23.

*95.*     Mr. Bogani negotiated the terms of the stock purchase agreement with Mr. Enright.  Bogani Tr., pp. 12:21-13:4.

*96.*     Mr. Bogani heard of Mr. McRoberts through Mr. Enright, who described him as being a finder of an investment opportunity, but Mr. Enright never met Mr. McRoberts nor had any discussions with him regarding the iBiz Technology transaction.  Bogani Tr., p. 15:1-18.

*97.*     Mr. Brovarone has no specific recollection of any conversation with Mr. McRoberts.  Brovarone Tr., p. 104: 12-17.

*98.*     Mr. Brovarone does not recall any telephone conversations with Mr. McRoberts when he received the copy of the stock purchase agreement signed by Mr. Firestone.  Brovarone Tr., p. 18, lines 3-10.

*99.*     Mr. Brovarone does not have any recollection of speaking with Mr. McRoberts about the securities purchase agreement.  Brovarone Tr., p. 65: 1-4.

*100.*     Mr. Brovarone made the arrangements with the transfer agent of iBiz Technology to have the sale of shares from Mr. Firestone to Equity Speculation Group reflected on the books of iBiz Technology, and new share certificates issued reflecting the transaction.  Brovarone Tr., pp. 25:3-26:3.

*101.*     The proceeds of Mr. Firestone's sale of stock to Equity Speculation Group were received by Mr. Brovarone and went directly to Mr. Firestone.  Brovarone Tr., pp. 45: 12-46:8.

*102.*    Mr. Brovarone was the primary draftsman of the stock purchase agreement. Brovarone Tr., pp. 62: 9-23; 94: 11-95:3; SEC Exhibit 24.

*103.*    Mr. Brovarone made arrangements for the delivery and transfer of certificates relating to Mr. Firestone's sale of securities to Sprout Investments. Brovarone Tr., pp. 65: 6-15; 71: 20-72:11; SEC Exhibits 42, 48, and 49.

*104.*    Mr. Enright has spoken with Mr. Firestone by telephone.  Enright Tr., pp. 17: 13-18: 3.

*105.*    Mr. Enright believes that Mr. Bogani chose Mr. Brovarone as the escrow agent for the purchase of stock from Mr. Firestone.  Enright Tr., p. 90: 12-21.

*106.*    Mr. Brovarone and Mr. Enright had done business prior to the sale of stock by Mr. Firestone.  Brovarone Tr., p. 53: 21-25.

*107.*    Equity Speculation Group LLC sent a wire transfer of $37,000 to Brovarone, as the escrow agent, as payment for the iBiz stock purchase on August 21, 2003 and later sent a check for the additional $1,500 to complete the purchase the iBiz shares.  Exhibits 28 and 36.

*108.*    Brovarone sent Firestone's share certificate by Federal Express courier to the transfer agent in Utah with instructions to transfer 20,000,000 of the shares into the name of Equity Speculation Group, and then return the new certificates to him. Exhibit 29.

*109.*     On August 25, 2003, Brovarone sent by wire transfer $30,480 to Firestone's bank account for the money from the first sale.  Exhibit 34.  On August 26, 2003, Firestone sent a wire transfer of $30,000 to Prolink Microsystems, one of iBiz Technology's suppliers in Taiwan.  Exhibit 135.

*110.*     On August 25, 2003, Brovarone paid $1,750 by check to Enright's wife, and sent a wire transfer of $1,730, which was $1,750 less the $20 wire fee, to McRoberts as his half of the $3,500 difference between the price paid by the buyer of $38,500 and the price received by the seller of $35,000. On September 2, 2003, Brovarone sent another wire transfer for an additional $1,730, which was $1,750

less the $20 wire fee, to McRoberts as his half of ten percent commission granted by Firestone from the $35,000 he received from the sale of iBiz shares.  Exhibits 39 and 79.

*111.*    Enright located another buyer, Sprout Investments LLC, to whom he offered the remaining 16 million of Firestone's iBiz shares.  Exhibit 40.

*112.*    McRoberts faxed a copy of the Stock Purchase Agreement to Sprout Investments.  Exh 41.

*113.*    In the Stock Purchase Agreement, Sprout Investments LLC agreed to purchase 5,000,000 of Firestone's shares for $7,975, which was a 50% discount from the closing bid price, and to pay a 5% fee to Primera Capital, a company owned by Mr. Enright.   Exhibit 41 and 44.

*114.*    On September 4, 2003, Brovarone sent a wire transfer for $5,505 to Firestone's bank account for the money from the second sale. Exhibit 47.  On September 5, 2003, Firestone sent a wire transfer of $5,000 to Catronics, another one of iBiz Technology's suppliers.  Exhibit 135.

*115.*    On September 4, 2003, McRoberts received a commission of $705 on the Sprout transaction ($725 less the $20 wire fee).  Exhibits 45, 46 and 79.

**h.    Voykin' Sale of 50,000,000 Unregistered Shares**

*116.*    In October 2003, iBiz prepared a consulting agreement for McRoberts to advise the company in exchange for 50,000,000 shares.  McRoberts did not sign the agreement.  Instead, McRoberts had another contract prepared in the name of his assistant, Daniel Voykin, who signed it on McRoberts behalf.  Exhibit 120, McRoberts Tr. 25:10-16,89:6-90:23; Exhibit  82.

*117.*    Dan Voykin was working for Mr. McRoberts at the time of the consulting agreement with iBiz Technology.  He had Mr. Voykin enter into a consulting contract with iBiz Technology because he understood that a contract to be used in connection with the stock to be issued under SEC Form S-8 had to be with an individual.  McRoberts Tr., pp. 25:10-26:9.

*118.* The consulting agreement between iBiz Technology and Mr. Voykin included services related to mergers and acquisitions. However, compensation for such services was not in the form of stock, but in cash, contingent on the completion of a transaction. SEC Exhibit 60, Doc. # 73-7, page 2.

*119.* On October 3, 2003, McRoberts sent Schilling a subscription agreement for the company to raise $1,000,000 through the sale of convertible debentures. See Exhibit 81.

*120.* At the request of Schilling, McRoberts had several telephone conversations with Bryan Scott at Synosphere LLC.

*121.* On November 20, 2003, McRoberts sent an email to Scott with corporate resolutions related to iBiz's possible acquisition of that company. McRoberts also introduced Schilling to a securities attorney, Jehu Hand. Exhibit 61.

*122.* McRoberts was in Phoenix, Arizona on November 4, 2003.

*123.* In November 2003, McRoberts emailed Voykin a copy of the iBiz consulting agreement and advised him "Just a straight consulting contract between you & the company & FOR THOSE SERVICES (that we are performing), REMUNERATION is paid in the form of S-8 shares (instead of cash)." Voykin signed the agreement on November 12, 2003. Exhibits 57 and 60.

*124.* On November 12, 2003, Voykin sent McRoberts an email containing an article on the appropriate uses for S-8 shares. McRoberts responded "We are in compliance on the S-8 Article." Exhibit 58 and 59.

*125.* In early December 2003, McRoberts telephoned Schilling and asked him to deliver the iBiz shares under the consulting agreement to Voykin, who worked with McRoberts as a team. Exhibit 112.

*126.* In December 2003, Schilling and Perkins directed iBiz to deliver 50,000,000 shares to Voykin. McRoberts Answer ¶ 67.

*127.* On December 10, 2003, iBiz, Schilling and Perkin sold 50,000,000 shares to Voykin as compensation under the consulting agreement. Exhibit 63.

*128.*    McRoberts gave Voykin instructions on how to sell the shares.  McRoberts Answer ¶ 70; Exhibit 67.

*129.*    Over the next week, Voykin sold the 50 million iBiz shares in 148 transactions for a total of $404,077.  McRoberts Answer ¶ 70; Exhibit 69.

*130.*    McRoberts instructed Voykin to send him the money from the sales of iBiz stock.  Once the last sale had cleared, Voykin wired the money to his personal bank account, from which he wrote a check to McRoberts for $298,889 and a second check to McRoberts' company, Eldorado Capital, LLC for $105,154. Exhibit 68.

*131.*    On January 6 and 7, 2004, McRoberts deposited the checks into the Eldorado Capital bank account. McRoberts Answer ¶ 70; Exhibits 69, 70, 71, 83, 85.

*132.*    On January 9, 2004, McRoberts transferred $320,043 of the money to Elephant Capital, LLC, an entity owned by Enright, to pay for publicity on behalf of iBiz.  McRoberts Answer ¶ 70; Exhibits 1, 85; Exhibit 120,

*133.*    There was no registration statement in effect for McRoberts and his assistant's offers and sales of the 50,000,000 shares.  McRoberts Answer ¶ 71.

*134.*    Mr. McRoberts believed he could provide consulting services to iBiz Technology to assist it in product sales.  McRoberts Tr., pp. 28:12 - 29:12.

*135.*    Under the consulting agreement with iBiz Technology, Mr. McRoberts evaluated iBiz Technology's managerial marketing and sales requirements. McRoberts Tr., p. 96:9-17.

*136.*    The consulting agreement with iBiz Technology was the first agreement that Mr. McRoberts worked with where compensation was to be in the form of shares registered under SEC Form S-8.  McRoberts Tr., pp. 94:14 – 95:1.

*137.*    Mr. McRoberts asked Mr. Enright to create a mailer for iBiz Technology for the purpose of advertising a keyboard.  McRoberts Tr., p. 32: 2-21.

*138.*    Mr. McRoberts was not involved in the preparation of the iBiz Technology product mailer.  Enright Tr., p. 96:23-25.

*139.* Mr. McRoberts sent Mr. Enright $320,040 to capitalize a product advertising campaign for iBiz Technology. Enright Tr., p. 62: 10-20.

*140.* iBiz Technology never received any payment from Mr. Voykin, Mr. McRoberts, or any of their affiliates. Schilling Tr., 2/9/05, p. 45: 13-16.

*141.* Neither Mr. Schilling nor any of his children received any payments from Mr. McRoberts or Mr. Voykin. Schilling Tr., 2/9/05, p. 48: 8-14.

### i.    Shares issued to Schilling and Perkins

*142.* On February 3, 2003, iBiz Technology issued 41,208,447 shares to Kenneth Schilling and 40,729,626 shares to Mark Perkins. Exhibits 157 and 158.

*143.* On or about June 12, 2003, iBiz Technology issued 58,461,383 shares to Kenneth Schilling and 58,246,872 shares to Mark Perkins. Exhibits 160, 161, 162, 164, 165.

### j.    Schilling Certifications of Annual and Quarterly Reports.

*144.* Schilling signed a certification for iBiz Technology's 2003 annual report on Form 10-KSB which was filed on February 13, 2004 and for each of the six subsequent amendments. Exhibits 142, 143, 144, 145, 146, 147 and 148 Schilling signed a certification for iBiz Technology's January 2004 quarterly report on Form 10-Q which was filed on March 15, 2004 and for each of the two subsequent amendments. Exhibits 149, 150, 151.

Mr. McRoberts believes that the following facts have been admitted and should be included in this section. The Plaintiff Securities and Exchange Commission objects to such inclusion:

160.    Based upon his relationship with Mr. Brovarone, if Mr. Brovarone perceived a possible legal problem with the purchase of iBiz Technology shares, Mr. Bogani would have expected Mr. Brovarone to bring that problem to his attention. Bogani Tr., p. 41:7-17.

161.    Mr. Brovarone never brought to Mr. Bogani's attention a possible problem with the purchase of iBiz shares. Bogani Tr., p. 41: 7-17.

164.    Mr. Bogani checked directly with the transfer agent and determined that the shares which Equity Speculation Group contemplated purchasing from Mr. Firestone had no stops or holds and were able to be resold.  Bogani Tr., p. 19:9-18.

171.    In drafting the stock purchase agreement, Mr. Brovarone included representations and warranties designed to provide comfort that the transaction was not an improper sale of unregistered securities.  Brovarone Tr., pp. 100: 16-101: 3.

176.    Mr. Enright expected that Mr. Brovarone, as an attorney specializing in securities matters, would have raised any regulatory issue relating to the sale of Mr. Firestone's stock to Equity Speculation Group.  Enright Tr., p. 91:2-17.

181.    On approximately November 11, 2003, Mr. McRoberts received an email from Mr. Voykin sending information prepared by an attorney that indicated that shares registered under SEC Form S-8 were freely tradable.  SEC Exhibit 58.

**2.    The following facts, although not admitted, will not be contested at trial by evidence to the contrary:**

**3.    The following issues of law are uncontested and stipulated to by the parties:**

*1.*    A public company may use a Form S-8 registration statement to register its offer and sale of shares to its consultant or advisor only if the consultant or advisor is a natural person, provides bona fide services, and the services are not in connection with the offer or sale of securities to raise money for the company, and the consultants do not directly or indirectly promote or maintain a market for the company's securities.  Exhibit 117, Form S-8 General Instruction A.1 (a) (1).

*2.*    Resales of shares by shareholders may be registered using a Form S-8 registration statement if it includes a reoffer prospectus.  Exhibit 117, Form S-8 Instruction C.1.

*3.*    Under the instructions for use of Form S-8, restricted shares acquired directly or indirectly from an issuer in a transaction not involving a public offering

may be included in a Form S-8 registration for reoffer and resale only if the restricted shares have been acquired by the selling shareholder prior to the filing of the registration statement.  Exhibit 117, General Instructions to Form S-8, C.1 (b).

*4.*      Restricted shares are defined as securities that are acquired either directly or indirectly from the issuer in a transaction or chain of transactions not involving any public offering. Restricted securities registered on a Form S-8 must be issued under an employee benefit plan. Restricted shares may be included in a reoffer prospectus only if they have been acquired by the selling security holder prior to the filing of the registration statement.  Exhibit 117, Form S-8 Instruction C.1 and 17 C.F.R. § 230.144(a) (3) (i).

*5.*      All persons holding restricted shares registered for reoffer or resale pursuant to a reoffer prospectus must be named as selling shareholders in the reoffer prospectus along with the amount of shares available to be resold.  Exhibit 117, Form S-8 Instruction C.3.

*6.*      The shares iBiz issued to Elliott, Voykin and Firestone were issued under an employee benefit plan.

*7.*      Elliott and Firestone acquired their shared directly from the company in a non-public offering of securities.


**D.      CONTESTED ISSUES OF FACT AND LAW**

**1.      The following are the issues of fact to be tried and decided**

1.      The SEC contends that iBiz Technology, Schillings and Perkins offered and sold securities to Firestone, Voykin, and Elliott when no registration statement was in effect for each of those transactions and no exemption from registration was available.  iBiz, Schilling and Perkins contend the shares were issued pursuant to an effective registration statement. McRoberts contends that the shares issued to Mr. Firestone and Mr. Voykin were issued pursuant to an effective registration statement.  Elliott contends that the shares issued to him were issued pursuant to an effective registration statement.

2.     The SEC contends that the July 25, 2003 Form S-8 registration statement did not effectively register the company's offer and sale of 36,691,177 shares to Firestone, where he engaged in capital raising for the company by paying at least $35,000 to the company's suppliers and additional funds directly to the company.  Exhibit 119.  iBiz, Schilling and Perkins contend that the shares were properly registered at the time they were issued. McRoberts contends that the Firestone shares were properly registered at the time they were issued.

3.     The SEC contends that the July 25, 2003 Form S-8 registration statement also did not effectively register Firestone's or McRoberts' direct or indirect offer or sale of Firestone's 36,691,177 shares because it does not contain a reoffer prospectus and neither Firestone nor McRoberts are named as selling shareholders.  iBiz, Schilling and Perkins contend that the shares were properly registered at the time they were issued.

4.     The SEC contends that the December 8, 2003 Form S-8 registration statement did not effectively register the company's offer and sale of 50,000,000 shares to Voykin, where Voykin or McRoberts engaged in capital raising for the company by paying Enright $320,040 to create an advertising mailer for iBiz Technology.  iBiz, Schilling and Perkins contend that the shares were properly registered.  McRoberts contends that the shares were properly registered at the time they were issued, and that payment for an advertising mailer, which was related to the consulting services, does not make the use of Form S-8 improper.

5.      The SEC contends that the December 8, 2003 Form S-8 registration statement did not effectively register the company's offer and sale of 50,000,000 shares to Voykin, where Voykin or McRoberts did not provide bona fide services to iBiz Technology in exchange for the 50,000,000 shares issued to Voykin.  iBiz, Schilling and Perkins contend that bona fide services were performed in exchange for the shares issued.  McRoberts contends that bona fide services were performed in exchange for the shares issued to Mr. Voykin.

6.     The SEC contends that the December 8, 2003 Form S-8 registration statement did not effectively register either Voykin's or McRoberts' direct or indirect offer and sale of the 50,000,000 shares, because the Form S-8 does not contain a reoffer prospectus and does not list

either Voykin or McRoberts as selling shareholders.  Exhibit 98.  Mr. McRoberts does not dispute this.

7.      The SEC contends that McRoberts directly or indirectly offered or sold Firestone's shares of iBiz Technology by his participation in, and receipt of a commission for, the sales of Firestone's 25,000,000 shares.  McRoberts contends that he did not directly or indirectly offer or sell the shares issued to Mr. Firestone because Mr. McRoberts neither sold nor solicited the sale of those securities and was not a substantial participant in the offer or sale of those securities.

8.      The SEC contends that McRoberts directly or indirectly offered or sold shares of iBiz Technology as a result of his participation in, and receipt of the money from, the Voykin's sales of 50,000,000 shares.  McRoberts contends that he was an indirect seller of Mr. Voykin's shares.

9.      The SEC contends that McRoberts acted as an underwriter in an unregistered distribution of iBiz Technology shares. McRoberts contends that he was not an underwriter with respect to any sales in which he was a seller of shares because he did not acquire such shares with a view to distribution for the issuer, nor did he participate in such a distribution.

10.     The SEC contends that the December 8, 2003 Form S-8 registration statement did not effectively register the company's offer and sale of 117,352,941 shares to Elliot, where he engaged in capital raising activities for the company by paying the company at least $593,600 or did not provide bona fide services.  Elliott contends that he did not engage in capital raising transactions.

11.     The SEC contends that the December 8, 2003 Form S-8 registration statement did not effectively register either Elliott's offer and sale of the 117,352,941 shares, because the Form S-8 does not contain a reoffer prospectus and does not list Elliott as a selling shareholder. Exhibit 98.

12.     The SEC contends that the April 19, 2004 Form S-8 registration statement did not effectively register the company's offer and sale of 65,000,000 shares to Elliott, where he

engaged in capital raising for the company or did not provide bona fide services.  Elliott contends that he did not engage in capital raising transactions

13.     The SEC contends that the April 19, 2004 Form S-8 registration statement did not effectively register the Elliott's offer and sale of 65,000,000 shares, because the Form S-8 does not contain a reoffer prospectus and does not list Elliott as a selling shareholder.

14.     The SEC contends that Elliott acted as an underwriter in an unregistered distribution of iBiz Technology shares.  Elliott contends that he did not act as an underwriter, issuer or dealer.

15.     The SEC contends that iBiz Technology and Schilling made false and misleading statements in the July 23, 2003 press release which stated that the company has "entered into a definitive agreement to acquire the assets of [Endeavor]."

16.     The SEC contends that iBiz Technology and Schilling made false and misleading statements in the July 23, 2003 press release which stated that Endeavour had begun mass production of the Virtual Keyboard.

17.     The SEC contends that iBiz Technology failed to disclose in its preliminary and definitive proxy statements filed on August 22, and September 12, 2003, and its preliminary and definitive proxy information sheets filed on September 3, and 22, 2003, that the company had no definitive agreement with Endeavour Capital AG to acquire the rights to the Virtual Keyboard and that iBiz Technology did not have a distribution agreement for the Virtual Keyboard.

18.     The SEC contends that Schilling knowingly aided and abetted iBiz Technology by causing it to fail to disclose in the preliminary and definitive proxy statements and proxy information statements filed in August and September 2003, that iBiz Technology had no definitive agreement with Endeavour Capital AG to acquire the rights to the Virtual Keyboard and that iBiz Technology did not have a distribution agreement for the Virtual Keyboard.

19.     The SEC contends that iBiz Technology fail to disclose in its preliminary and definitive proxy statements filed on August 22, and September 12, 2003, and its preliminary and definitive proxy  information sheets filed on September 3, and 22, 2003, that a change in control of the company had occurred since the end of its last fiscal year on October 31, 2002,

by failing to disclose that Schilling and Perkins had acquired control of the company by issuing over 116 million shares to themselves for past and future salaries.

20.    The SEC contends that Schilling aided and abetted iBiz Technology by causing it to fail to disclose in the preliminary and definitive proxy statements and proxy information statements filed in August and September 2003, that a change in control of the company had occurred since the end of its last fiscal year on October 31, 2002, by failing to disclose that Schilling and Perkins had acquired control of the company by issuing over 116 million shares to themselves for past and future salaries.

21.    The SEC contends that between December 30, 2003 and February 2004, iBiz Technology, Schilling and Perkins made false and misleading statements in press releases by referring to the Virtual Keyboard as the "iBIZ Technology Virtual Keyboard" or as iBIZ Technology's "latest creation" when they knew that the company did not have a definitive agreement to acquire the rights to the Virtual Keyboard.

22.     The SEC contends that during January 2004, iBiz Technology and Schilling made false and misleading statements in two online interviews by failing to disclose that iBiz Technology did not have a definitive agreement to acquire the rights to the Virtual Keyboard.

23.    The SEC contends that during January and February 2004, iBiz Technology, Schilling, and Perkins made false and misleading statements that iBiz Technology had an exclusive licensing agreement to market the Virtual Keyboard Technology.

24.    The SEC contends that during January 2004, iBiz Technology, Schilling and Perkins made false and misleading statements in a press release that the Virtual Keyboard was now shipping.

25.    The SEC contends that on May 3, 2004, iBiz Technology, Schilling and Perkins made false and misleading statements that "The much anticipated Virtual Laser Keyboard [is] now in stock" and "ready for shipping."

26.    The SEC contends that on May 3, 2004, iBiz Technology, Schilling and Perkins fail to disclose that the 102 Virtual Keyboards that the company had received were defective.

27.     The SEC contends that Schilling and Perkins made the false and misleading statements or omissions of material facts knowingly or recklessly.

28.     The SEC contends that iBiz Technology, through the knowledge of its officers and directors who were Schilling and Perkins, made the false and misleading statements or omissions of material fact knowingly or recklessly.

29.     The SEC contends that iBiz Technology made false and misleading statements in its 2003 Form 10-K annual report filed on February 13, 2004 with subsequent amendments, and its January 31, 2004 Form 10-Q quarterly report filed on March 15, 2004 with subsequent amendment, when the company failed to disclose that that there was no definitive agreement with Endeavour to acquire the license to market the Virtual Keyboard.

30.     The SEC contends that Schilling and Perkins knowingly aided and abetted iBiz Technology by causing it to make false and misleading statements in its 2003 annual report and January 2004 quarterly report and subsequent amendments when they knowingly caused the company to fail to disclose that that there was no definitive agreement with Endeavour to acquire the license to market the Virtual Keyboard.

31.     Schilling falsely certified that the 2003 annual report and the January quarterly report and the subsequent amendments contained no untrue statements of fact or omissions of material facts.

32.     The SEC contends that in November 2003, iBiz Technology, Schilling and Perkins failed to disclose at the time they were stating the company had cash and conventional credit facilities in place to handle voluminous orders that they were anticipating, that in fact the company's continued operations as well as the implementation of its business plan depended upon its ability to raise approximately $1,000,000 in additional funds over the next 12 months.

33.     The SEC contends that iBiz Technology, Schilling and Perkins failed to disclose in April 2004 that the company was close to losing a Circuit City order because they had not delivered any Virtual Keyboards.

34.     The SEC contends that iBiz Technology, Schilling and Perkins failed to disclose in April 2004 that VKB would not cooperate with iBiz and allow the company to build drivers for the Virtual Keyboard, which were a critical piece for the success of the device.

35.     The SEC contends that iBiz Technology, Schilling and Perkins failed to disclose in April 2004 that the Virtual Keyboards cost $100 to manufacture.

    2.     **The following are the issues of law to be tried and determined.**

1.     The SEC contends that iBiz Technology, Schilling, Perkins, McRoberts and Elliott each violated the securities registration provisions of Section 5(a) and(c) of the Securities Act, 15 U.S.C. § 77e (a) and (c).  Mr. McRoberts contends that he did not.  He was not a "seller" of Mr. Firestone's shares.  The sales of shares issued to Mr. Voykin were exempt pursuant to Section 4(1) of the Securities Act of 1933 [15 U.S.C. § 77d(1)] because he was neither an issuer, underwriter, nor dealer.  Elliott contends that his transactions were exempt under Section 4(1) of the Securities Act.

2.     The SEC contends that iBiz Technology, Schilling, and Perkins each violated the anti-fraud provisions of Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j (b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

3.     The SEC contends that iBiz Technology violated the annual and quarterly reporting provisions of Section 13(a) of the Exchange Act, 15 U.S.C. § 78m (a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. § 240.12b-20, 13a-1 and 13a-13.

4.     The SEC contends that Schilling and Perkins aided and abetted iBiz Technology's violations of the annual and quarterly reporting provisions of Section 13(a) of the Securities Exchange Act, 15 U.S.C. § 78m (a), and Rules 12b-20 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 13a-1 and 13a-13.

5.     The SEC contends that iBiz Technology violated the proxy information provisions of Section 14(a) and (c) of the Exchange Act, 15 U.S.C. § 78n (a) and (c), and Rules 14a-3, 14a-9 and 14c-2 and 14c-6, 17 C.F.R. §§ 240.14a-3, 14a-9 and 14c-2 and 14c-6.

6.    The SEC contends that Schilling aided and abetted iBiz Technology's violations the proxy information provisions of Section 14(a) and (c) of the Exchange Act, 15 U.S.C. § 78n (a) and (c), and Rules 14a-9 and 14c-6, 17 C.F.R. §§ 240.14a-9 and 14c-6.

7.    The SEC contends that Schilling falsely certify the annual and quarterly reports in violation of Rule 13a-4, 17 C.F.R. § 240.13a-4.

8.    The SEC contends that the Court should enter a permanent injunction against each of the defendants from future violations of the federal securities laws alleged in this case because there is a likelihood that the defendants will violate these securities provisions again and should order the defendants to disgorge the ill-gotten gains from their violations of the federal securities laws.  Mr. McRoberts' position is that neither an injunction nor disgorgement should be entered.  He is neither in the process of, or about to, violate any provisions of the federal securities laws in the future.  No payments or proceeds of sales are the result of any illegal conduct by Mr. McRoberts.  It is the position of iBiz, Schilling and Perkins that neither an injunction nor disgorgement should be entered.  They are not in the process of, or about to, violate any provisions of the federal securities laws in the future.  No payments or proceeds of issuance of stock are the result of any illegal conduct by either iBiz, Schilling or Perkins.  Elliott contends that an injunction is not warranted because there is no evidence that he will violate the federal securities laws in the future.  Disgorgement is not warranted because the proceeds received by Elliott were not ill gotten gains and did not result from any illegal contact by Elliott.

9.    The SEC contends that the Court should order the defendants to pay prejudgment interest upon the ill-gotten gains received from their violations of the federal securities laws.  Mr. McRoberts' position is that no interest on ill-gotten gains should be ordered, since there were no ill-gotten gains.  In the event that the jury determines that Mr. McRoberts engaged in any illegal conduct, his good faith belief in the legality of his conduct warrants that no interest be required if disgorgement is ordered at all.  It is the position of iBiz, Schilling and Perkins that no interest on ill-gotten gains should be

1    ordered, since there were no ill-gotten gains.  In the event that the jury determines that

2    iBiz, Schilling or Perkins engaged in any improper conduct, their good faith belief in

3    the legality of their conduct warrants that no interest be required if disgorgement is

4    ordered at all.  Elliott contends that he acted in good faith and that the award of interest

5    would be punitive and unjustified.

6    10.   The SEC contends that the Court should impose a civil penalty against each of the

7    defendants pursuant to Section 20(d) of the Securities Act for each of the defendant's

8    violations of the securities registration provisions of Section 5(a) and (c) of the

9    Securities Act.  Mr. McRoberts' position is that no civil penalty is warranted since there

10   were no violations of the law.  If it is found that Mr. McRoberts engaged in violations

11   of the law, they were not egregious, were made in the good faith belief of the legality

12   his actions, were isolated, and, therefore, do not warrant the imposition of a civil

13   penalty.  It is the position of iBiz, Schilling and Perkins that no civil penalty is

14   warranted since there were no violations of the law.  If it is found that iBiz, Schilling or

15   Perkins engaged in violations of the law, they were not egregious, were made in the

16   good faith belief of the legality of their actions, were isolated, and, therefore, do not

17   warrant the imposition of a civil penalty.  Elliott's alleged violations were not egregious

18   and he acted in good faith and therefore a penalty is not warranted.

19   11.   The SEC contends that the Court impose a civil penalty against iBiz Technology,

20   Schilling, and Perkins pursuant to Section 21(d)(3) of the Exchange Act for the

21   defendant's violations or aiding and abetting of violations of Sections 10(b), 13(a) and

22   14(a), except Perkins as to the Section 14(a).  It is the position of iBiz, Schilling and

23   Perkins that no civil penalty is warranted since there were no violations of the law.  If it

24   is found that iBiz, Schilling or Perkins engaged in violations of the law, they were not

25   egregious, were made in the good faith belief of the legality of their actions, were

26   isolated, and, therefore, do not warrant the imposition of a civil penalty.

27   12.   The SEC contends that the Court should order that Schilling and Perkins are barred

28   from serving as officers or directors of public companies pursuant to Section 20(e) of

the Securities Act and Section 21(d)(2) of the Exchange Act.  It is the position of Schilling and Perkins that neither of them should be barred from serving as officers or directors of public companies.  They are not in the process of, or about to, violate any provisions of the federal securities laws in the future

13.     The SEC contends that the Court should order that Schilling, Perkins, Elliott and McRoberts are barred from participating in the offering of penny stocks pursuant to Section 20(g) of the Securities Act, and additionally as to Schilling and Perkins pursuant to Section 21(d)(6) of the Exchange Act. Mr. McRoberts position is that no penny stock bar is warranted because he did not violate the law.  If he did engage in conduct found to violate the law, he did so in the good faith belief that his conduct was lawful, such that a penny stock bar is not warranted.  It is the position of Schilling and Perkins that neither of them should be barred from participating in the offering of penny stocks.  They are not in the process of, or about to, violate any provisions of the federal securities laws in the future.  It is Elliott's position that he should not be subject to a penny stock bar because he acted in good faith.

E.      LIST OF WITNESSES:

**Plaintiff's Witnesses**:

(1)     WITNESSES WHO SHALL BE CALLED AT TRIAL.

1.      Kenneth Schilling, 8512 W. Via Montoya Drive, Peoria, AZ 85383, a fact witness and defendant, will testify about negotiations to obtain the virtual keyboard, preparation of press releases, annual and quarterly reports, and interviews about the company's acquisition, production, shipping and revenues to be earned from sales of the virtual keyboard. Additionally, he will testify about his knowledge of the company's issuance of shares to Firestone, Elliott and Voykin, any services provided by them, the receipt of any funds from them or paid for the benefit of the company, and the company's registration statements on Form S-8, his own sales of iBiz securities, conversion of debentures by the company's creditors, and his preparation of proxy statements.

2.      H. Mark Perkins, 25213 N. 47 Drive, Glendale, AZ 85310, a fact witness and

defendant, will testify about negotiations to obtain the virtual keyboard, preparation of press releases, annual and quarterly reports about the company's acquisition, production, quality, shipping and revenues to be earned from sales of the virtual keyboard. Additionally, he will testify about his knowledge of the company's issuance of shares to Firestone, Elliott and Voykin, any services provided by them, the receipt of any funds from them or paid for the benefit of the company, and, the company's registration statements on Form S-8, his own sales of iBiz securities, and conversion of debentures by the company's creditors.

3.    D. Scott Elliott, 608 Fern Street, Anna Maria, FL 34216, a fact witness and defendant, will testify about his consulting agreement with iBiz Technology Corporation, his receipt of shares as compensation, his purchase of shares from the company and resales, and funds paid to the company.

4.    Jerrold B. Mc Roberts, 93 Camino Cabo, Santa Fe, NM 87508, a fact witness and defendant, will testify about his arrangement to find a purchaser of iBiz Technology shares owned by Firestone in exchange for a commission, the consulting agreement he negotiated with the company, the issuance of shares to his assistant, Dan Voykin, and the subsequent sale of those shares and use of the proceeds to provide promotional services to the company.

5.    Geoff Clein, 2 Giladi, Entrance C, Jerusalem, Israel 93385, a fact witness and partner in Enterprise Capital AG, will testify about the negotiations between iBiz Technology and Endeavour Capital for the purchase of a license to produce and sell the Virtual Keyboard, problems related finalizing the transaction, problems with production and shipping and the end of the agreement between the parties.

6.    Dan Voykin, 5309 E. Juniper, Scottsdale, AZ  85254, a fact witness, will testify about his business arrangement with McRoberts, the consulting agreement with iBiz Technology, his receipt and sale of shares from the company and transfer of the proceeds from the sale to McRoberts.

7.    Paul Enright, 8598 S. Miller Ct, Littleton, CO 80127, a fact witness, will testify (via admission of his video deposition) about his partnership with McRoberts, the offer for sale of Firestone shares, receipt of funds from McRoberts to pay for promotional services provided

to iBiz Technology.

8.    <u>Mark Bogani</u>, 10484 E. Berry Drive, Greenwood Village, CO  80111, a fact witness will testify (via admission of his video deposition), about Equity Speculation Group LLC purchasing 20 million shares of IBIZ stock from Firestone.

9.    <u>Dennis Brovarone</u>, 18 Mountain Laurel, Littleton, Colorado 80127-2228, a fact witness, will testify (via admission of his video deposition) about his activities as an escrow agent for the sale of Firestone's shares to Equity Speculation Group LLC and Sprout Investments.

10.    <u>Kerry Matticks</u>, Securities and Exchange Commission, 1801 California Street Suite 1500, Denver, CO  80202, a summary witness, will testify about sales of shares by the defendants, changes in number of shares held by the defendants, changes in price of iBiz Technology shares, telephone calls between the defendants, shares issued to debenture or note holders.

11.    <u>Hugh Beck</u>, Securities and Exchange Commission, 1801 California Street Suite 1500, Denver, CO 80202, a summary witness, will testify about changes in number of shares held by the defendants.  He may also testify as a fact witness about statements made by the defendants during the investigation and the source of various documents obtained by the SEC during its investigation in this matter.

12.    <u>Marion Jenkins</u>, 19055 North 13th St., Phoenix, AZ 85024-2381; Ph. (602)228-8037, a fact witness, will testify about his purchase of shares of iBiz Technology Corporation, and his reliance on iBIZ's website and other information about iBiz provided to the public.

13.    <u>Bryan Wallace</u>, 400 Glyn Tawel Dr., Granville, OH 43023-1528, a fact witness, will testify about his purchase of shares of iBiz Technology Corporation, and his reliance on iBIZ's website and other information about iBiz provided to the public.

14.    <u>David Savage</u>, 72 Ferry St., South Grafton, MA 01560-1345, a fact witness, will testify about his purchase of shares of iBiz Technology Corporation, and his reliance on iBIZ's website and other information about iBiz provided to the public.

15.    <u>Chris DiRado</u>, 126 Mount Pleasant St., Marlboro, MA 01752, a fact witness,

will testify about his purchase of shares of iBiz Technology Corporation and his reliance on iBIZ's website and other information about iBiz provided to the public.

     (2)     WITNESSES WHO MAY BE CALLED AT TRIAL

16.     <u>Mike Mathews</u>, 15847 N. 63rd Drive, Glendale, AZ 85306, a fact witness, may testify about production and quality problems related to the Virtual Keyboard, and his receipt of shares of iBiz Technology during 2003.

17.     <u>Stanley Moffitt</u>, 11811 N. Tatum Blvd. Suite 2600, Phoenix, AZ 85028, a fact witness, may testify about statements made by Schilling and Perkins on the purpose for issuing shares to themselves, Firestone, Elliott, and Voykin, workpapers used in accounting for the issuance of shares, and the accounting treatment for any sales of the Virtual Keyboard.

18.     <u>Janine Notti,</u> 11811 N. Tatum Blvd. Suite 2600, Phoenix, AZ 8502,  a fact witness, may testify about statements made by Schilling and Perkins on the purpose for issuing shares to themselves, Firestone, Elliott, and Voykin, workpapers used in accounting for the issuance of shares, and the accounting treatment for any sales of the Virtual Keyboard.

19.     <u>Marc Thomas or Barbara Jacobs,</u> Securities and Exchange Commission, 100 F Street NE, Washington DC 20549, a fact witness, may testify about the issuance of the Division of Corporation Finance's comment letter on the iBiz Inc.'s registration statement.

20.     <u>Jessie Schilling</u>, c/o John Karow, 11350 North 104th Place, Scottsdale, AZ 85359, a fact witness, may testify about her employment with iBiz Technology Corporation, problems with the production of the Virtual Keyboard, and her receipt of over $84,000 from Firestone.

     (3)     WITNESSES WHO ARE UNLIKELY TO BE CALLED AT TRIAL

21.     <u>Kurt Hughes or Katherine Leautatu</u>, of Interwest Transfer Company, Inc. fact witnesses may testify about instructions received from Schilling and Perkins to issue iBiz Technology shares to themselves, Firestone, Elliott, and Voykin.

22.     <u>Jonathan Curtiss</u>, c/o Lumio Ltd., 5 Nahum Hefzadi, Beit Ofer, Jerusalem, 95484, Israel, the former president of VKB Inc., a fact witness, may testify about the licensing contract for the Virtual Keyboard issued to Pangea Investments GmbH

23.     Frank Ligammari, 3625 E. Garden Dr., Phoenix, AZ 85051, a fact witness, may testify about production and quality problems related to the Virtual Keyboard, and his receipt of shares of iBiz Technology during 2003.

24.     Paul Russo, 5443 W Eugie Avenue, Glendale, AZ 85304, a fact witness, may testify about production and quality problems related to the Virtual Keyboard, and his receipt of shares of iBiz Technology during 2003.

25.     Brian Allan Scott, 6217 York Bridge Circle, Austin, TX 78749, a fact witness, may testify about his negotiations with iBiz Technology to merge the company, the need for capital raising activities by the company, and his knowledge of problems with the production of the Virtual Keyboard.

**Defendants' Witnesses:**

**Witnesses for iBiz, Schilling and Perkins:**

1.     Kenneth Schilling, 8512 W. Via Montoya Drive, Peoria, AZ 85383, a fact witness will testify about his knowledge of the facts involving the negotiation of the virtual keyboard licensing and manufacturing agreements, the payments by iBiz for the manufacturing of the virtual keyboard, the receipt of product, the preparation of press releases, annual and quarterly reports, and interviews about the company's acquisition, production, shipping and revenues to be earned from sales of the virtual keyboard, the advice received and the company's registration statements on Form S-8, his own sales of iBiz securities, conversion of debentures by the company's creditors, and his preparation of proxy statements.

2.     H. Mark Perkins, 25213 N. 47 Drive, Glendale, AZ 85310, a fact witness will testify about  his knowledge of the facts involving the negotiation of the virtual keyboard licensing and manufacturing agreements, the payments by iBiz for the manufacturing of the virtual keyboard, the receipt of product, the preparation of press releases, annual and quarterly reports, and interviews about the company's acquisition, production, shipping and revenues to be earned from sales of the virtual keyboard, the advice received and the company's registration statements on Form S-8, his own sales of iBiz securities, conversion of debentures by the company's creditors, and his preparation of proxy statements.

**Elliott's witnesses:**

**Witnesses who shall be called to testify:**

1.      D. Scott Elliott, Mr. Elliott will testify on the services that he provided to iBiz, consulting agreements, the options issued to him by the company, the exercise of his options, the payment for the exercise of his options and the sale of stock by him.  Mr. Elliott will testify as to his relationship with the company and its officers, his discussions with the officers of iBiz and his belief that his sales of stock complied with the law.


**Witnesses who may be called to testify:**

2.      Mark Perkins, Mr. Perkins will testify on the subjects mentioned by Plaintiff and Defendant Perkins if called to testify.

3.      Kenneth Schilling, Mr. Schilling will testify on the subjects mentioned by Plaintiff and Defendant Schilling if called to testify.

**McRoberts' Witnesses:**

The following witnesses will be called at trial:

1.      Jerrold B. Mc Roberts, 93 Camino Cabo, Santa Fe, NM 87508, a fact witness will testify about his arrangement to find a purchaser of iBiz Technology shares owned by Firestone in exchange for a commission, the consulting agreement he negotiated with the company, the issuance of shares to his assistant, Dan Voykin, and the subsequent sale of those shares and use of the proceeds to provide promotional services to the company.

2.      Dan Voykin, 5309 E. Juniper, Scottsdale, AZ  85254, a fact witness will testify about his business arrangement with McRoberts, the consulting agreement with iBiz Technology, his receipt and sale of shares from the company and transfer of the proceeds from the sale to McRoberts. (by deposition)

3.      Paul Enright, 8598 S. Miller Ct, Littleton, CO 80127, a fact witness may testify or his testimony will be presented through entry of his deposition, about his partnership with McRoberts, offer for sale of Firestone shares, receipt of funds from McRoberts to pay for promotional services provided to iBiz Technology.  (by deposition)

4.     Mark Bogani, 10484 E. Berry Drive, Greenwood Village, CO  80111, a fact witness may testify or his testimony will be presented through entry of his deposition, about Equity Speculation Group LLC purchasing 20 million shares of IBIZ stock from Firestone.(by deposition)

5.     Dennis Brovarone, 18 Mountain Laurel, Littleton, Colorado 80127-2228, a fact witness may testify or his testimony will be presented through entry of his deposition, about his activities as an escrow agent for the sale of Firestone's shares to Equity Speculation Group LLC and Sprout Investments.(by deposition)

Each party understands that it is responsible for ensuring that the witnesses it wishes to call to testify are subpoenaed.  Each party further understands that any witness a party wishes to call shall be listed on that party's list of witnesses above and that party cannot rely on that witness having been listed or subpoenaed by another party.

F.     LIST OF EXHIBITS

1.     The following exhibits are admissible in evidence and may be marked in evidence by the Clerk:

    a.     Plaintiff's Exhibits:  McRoberts stipulates to 1 through 60; 63; 69-74; 77; 79; 82-85; 133; 230-233, 289.

        Elliott stipulates to 63, 86-102, 105-108, 110, 116, 118-121, 128-129, 132-133, 137, 139-152a, 154, 156, 293-294.

        iBiz, Schilling, and Perkins stipulate to Exhibits 1-166, 169-287, 300-305.

    b.     Defendant Elliott's Exhibits:  330 and 331.

    c.     Defendants iBiz, Schilling and Perkins:  A Virtual Keyboard unit.; all exhibits presented by Plaintiff.

2.     As to the following exhibits, the parties have reached the following stipulations: The following Exhibits are not being offered against Mr. McRoberts, and he takes no position to their admissibility:  80; 86 -116; 118-130; 134-233; 236-288, 290-297; 299-303.

3.      As to the following exhibits, the party against whom the exhibit is to be offered objects to the admission of the exhibit and offers the objection stated below:

a.      McRoberts objects to Exhibits 61 - 62; 81.  FRE 402.  These Exhibits relate to potential merger and acquisition activity, which is contemplated under the consulting agreement signed by Mr. Voykin, but which is not to be compensated by stock but by cash.

b.      McRoberts objects to Exhibits 64-68; 75, 76, 304.  FRE 403 (waste of time).  These exhibits demonstrate Mr. McRoberts' participation in the sales made by Mr. Voykin.  However, Mr. McRoberts does not dispute he was a substantial participant in those sales.

c.      McRoberts objects to Exhibits 117 and 131.  FRE 402 and 403.  These exhibits are, respectively, instructions for the completion of SEC Form S-8, and SEC Rule 144.  They are not probative of any factual issue.  To the extent these authorities relate to any legal issue, it is the Court's function to provide appropriate instructions.

d.      McRoberts objects to Exhibit 234.  FRE 802 and 805.  This exhibit contains an email from Mr. Schilling attributing a statement to Mr. McRoberts.  However, Mr. Schilling has stated under oath that that he did not personally hear Mr. McRoberts make the statement, but that he was informed of it by Mr. Firestone.  Schilling Transcript February 8, 2005, page 183, lines 12-18.

e.      McRoberts objects to Exhibit 298.  FRE 402, 403, 702, and 802.  This exhibit purports to be a flow chart, the preparer of which is not identified, but is presumed to be someone at the SEC, which purports to show that shares sold by Mr. Voykin were used to raise capital for iBiz through a payment to an "iBiz vendor."  The reference to "raising capital" and to an "iBiz vendor" is hearsay and an opinion of the evidence which is legally incorrect.  Further, the evidence is not

probative of anything at issue and is likely to result in confusion to the jury.

f.     McRoberts objects to Exhibit 304 and 305, F.R.E. 402 and 403

g.     Elliott objects to Exhibits 1-62, 64-85, 157-277, 281-289, 291-292, 296-298, and 300-305 as not relevant to the claims against him.

h.     Elliott objects to Exhibits 103, on relevance and foundation.

i.     Elliott objects to Exhibits 109, 111-113, 114-115 on relevance and not disclosed on time.

j.     Elliott objects to Exhibits 109, 114-115 on relevance, foundation and not disclosed on time.

k.     Elliott objects to Exhibits 117 and 131 as inappropriate to introduce law into evidence.  Elliott contends that Rule 144 has no relevance to the sales in this case.

l.     Elliott objects to Exhibit 134 on hearsay and on relevance.

m.     Elliott objects to Exhibits 135-136, 138 on relevance.

n.     Elliott objects to 152b-153 on relevance.

o.     Elliott objects to Exhibit 290 on foundation

p.     Elliott objects to Exhibits 295 on relevance and foundation

q.     Elliott objects to Exhibits 299 as cumulative and contends it is an inaccurate summary of evidence

r.     Elliott notes Exhibits 104, 278-280 – No documents are marked as exhibits.

s.     iBiz, Schilling and Perkins object to Exhibits 167, 168, 288 through 299 on the basis of lack of foundation and hearsay.

4.     Each party hereby acknowledges by signing this **joint** Proposed Final Pretrial Order that any objections not specifically raised herein are waived.  Counsel for defendants, iBiz Technology, Schilling and Perkins, objects to this statement.

G.     DEPOSITIONS TO BE OFFERED:

Plaintiff intends to introduce the following video deposition testimony of **Dennis Brovarone**
dated August 21, 2007.

Page/Line

| | |
|---|---|
| [8:5] - [8:8] | [46:12] - [47:8] |
| [8:10] - [9:7] | [47:10] - [47:21] |
| [9:10] - [10:7] | [48:1] - [49:5] |
| [10:8] - [10:11] | [49:6] - [50:9] |
| [10:22] - [11:19] | [50:10] - [51:16] |
| [12:13] - [13:6] | [51:18] - [53:8] |
| [13:7] - [13:10] | [53:11] - [53:25] |
| [13:22] - [14:10] | [58:15] - [60:6] |
| [15:3] - [15:23] | [60:25] - [63:23] |
| [15:24] - [16:12] | [63:24] - [65:25] |
| [16:21] - [17:13] | [66:1] - [66:4] |
| [17:14] - [18:3] | [66:6] - [67:1] |
| [18:4] - [18:6] | [67:11] - [68:19] |
| [18:7] - [19:16] | [68:25] - [70:14] |
| [19:17] - [20:12] | [70:18] - [71:15] |
| [20:13] - [20:16] | [72:4] - [73:11] |
| [20:22] - [21:4] | [73:17] - [74:3] |
| [21:5] - [21:20] | [74:4] - [77:3] |
| [21:21] - [23:4] | [79:12] - [80:22] |
| [23:12] - [24:2] | [81:3] - [81:23] |
| [24:3] - [25:2] | [82:1] - [83:5] |
| [25:3] - [25:23] | [83:6] - [83:10] |
| [26:3] - [28:5] | [83:12] - [83:19] |
| [28:6] - [30:17] | [83:22] - [85:19] |
| [31:8] - [33:22] | [85:20] - [86:10] |
| [33:23] - [34:9] | [95:11] - [95:22] |
| [34:10] - [36:18] | [96:4] - [96:11] |
| [37:17] - [38:12] | [96:24] - [97:6] |
| [38:13] - [40:4] | [97:7] - [97:20] |
| [40:17] - [41:24] | [98:7] - [98:18] |
| [42:3] - [43:3] | [107:19] - [108:18] |
| [43:18] - [44:8] | [108:19] - [109:13] |
| [44:9] - [45:12] | [109:14] - [110:4] |
| [45:13] - [46:8] | [110:9] - [111:1] |

Plaintiff intends to introduce the following video deposition testimony of **Paul Enright** dated
August 21, 2007.

Page/Line

| | |
|---|---|
| [7:9] - [7:19] | [7:22] - [8:1] |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[8:19] - [9:12]                    [44:16] - [45:21]
[10:1] - [10:15]                   [46:5] - [47:20]
[10:20] - [10:22]                  [47:21] - [49:6]
[11:7] - [11:10]                   [49:7] - [50:4]
[11:19] - [12:10]                  [50:5] - [51:3]
[13:6] - [13:9]                    [51:4] - [52:3]
[13:11] - [14:3]                   [52:4] - [52:11]
[14:23] - [15:14]                  [52:12] - [53:4]
[15:15] - [16:7]                   [53:5] - [53:9]
[16:14] - [17:12]                  [53:13] - [54:11]
[18:13] - [18:15]                  [54:15] - [55:11]
[18:19] - [19:9]                   [55:24] - [57:9]
[19:10] - [19:14]                  [57:10] - [59:5]
[19:16] - [19:25]                  [59:20] - [61:7]
[20:1] - [20:15]                   [61:11] - [62:2]
[20:20] - [21:4]                   [62:3] - [63:13]
[21:5] - [21:12]                   [63:14] - [64:14]
[21:13] - [21:20]                  [64:15] - [65:11]
[23:17] - [24:3]                   [65:12] - [67:3]
[24:14] - [24:23]                  [67:4] - [67:14]
[25:8] - [25:21]                   [67:15] - [68:3]
[25:22] - [26:22]                  [69:3] - [69:11]
[27:21] - [28:13]                  [69:12] - [70:12]
[29:7] - [29:12]                   [70:13] - [71:7]
[29:16] - [30:4]                   [71:13] - [73:4]
[30:5] - [30:11]                   [77:23] - [78:16]
[30:20] - [31:6]                   [79:1] - [79:5]
[32:3] - [32:22]                   [79:14] - [79:25]
[34:18] - [35:10]                  [87:18] - [88:8]
[35:11] - [36:1]                   [93:13] - [94:9]
[36:5] - [36:20]                   [94:24] - [95:10]
[36:24] - [37:1]                   [95:24] - [96:10]
[37:2] - [37:6]                    [97:23] - [98:14]
[37:14] - [38:14]                  [101:4] - [101:17]
[38:24] - [39:9]                   [101:22] - [102:6]
[40:2] - [40:19]                   [103:12] - [103:15]
[40:20] - [41:4]                   [103:16] - [104:19]
[41:5] - [42:6]                    [104:20] - [106:5]
[42:7] - [42:20]                   [106:20] - [107:24]
[42:21] - [43:14]                  [111:13] - [112:24]
[43:15] - [44:15]                  [113:6] - [113:17]

Plaintiff intends to introduce the following video deposition testimony of **Mark Bogani** dated

September 5, 2007.

-40-

<u>Page/Line</u>
[6:8] - [6:10]
[6:13] - [7:14]
[8:1] - [9:4]
[9:4] - [11:13]
[11:21] - [13:23]
[13:24] - [15:15]
[15:23] - [18:11]
[18:11] - [21:19]
[21:20] - [22:12]
[22:18] - [24:9]
[24:17] - [28:23]
[29:7] - [31:17]
[32:2] - [34:4]
[34:15] - [34:17]
[44:23] - [45:15]
[46:21] - [46:23]

Plaintiff intends to introduce the following video deposition testimony of **Jerrold McRoberts** dated September 24, 2007, if he does not appear at trial or for impeachment

.

<u>Page/Line</u>
[8:4] - [8:13]
[8:25] - [9:5]
[9:14] - [10:3]
[10:10] - [10:19]
[10:20] - [10:24]
[11:18] - [12:24]
[12:25] - [13:1]
[13:10] - [14:10]
[14:14] - [14:16]
[15:2] - [16:3]
[16:4] - [17:5]
[17:17] - [18:14]
[18:19] - [19:5]
[19:12] - [19:23]
[20:3] - [20:23]
[21:7] - [22:11]
[22:15] - [23:12]
[23:13] - [25:16]
[25:17] - [26:20]
[26:21] - [27:7]
[27:8] - [27:13]
[27:17] - [28:4]
[28:12] - [29:1]

[29:2] - [30:9]
[30:10] - [31:6]
[32:9] - [32:17]
[32:17] - [32:21]
[32:22] - [33:5]
[33:11] - [34:5]
[34:17] - [35:11]
[35:12] - [35:17]
[35:18] - [35:24]
[36:5] - [37:1]
[37:2] - [37:25]
[38:1] - [38:24]
[38:25] - [39:5]
[39:6] - [40:4]
[40:5] - [41:8]
[41:9] - [42:22]
[42:23] - [43:18]
[44:20] - [45:8]
[45:9] - [45:10]
[45:22] - [46:20]
[46:21] - [46:25]
[47:1] - [48:14]
[48:22] - [49:7]
[49:20] - [49:25]
[50:5] - [50:7]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[50:14] - [51:15]

[51:18] - [51:23]

[51:24] - [53:19]

[53:20] - [54:17]

[54:25] - [55:8]

[55:9] - [56:1]

[56:7] - [57:7]

[57:21] - [58:14]

[58:15] - [59:18]

[60:24] - [61:12]

[61:13] - [62:2]

[62:19] - [62:25]

[64:16] - [65:8]

[65:14] - [65:24]

[66:3] - [67:3]

[67:6] - [67:21]

[68:4] - [69:4]

[69:5] - [69:21]

[70:3] - [70:5]

[70:15] - [71:2]

[71:9] - [71:11]

[71:15] - [73:4]

[73:9] - [75:9]

[75:13] - [76:4]

[76:5] - [76:9]

[76:10] - [78:10]

[78:11] - [79:9]

[79:16] - [80:20]

[81:8] - [82:10]

[82:11] - [83:10]

[83:11] - [83:24]

[83:25] - [84:5]

[84:6] - [85:23]

[86:9] - [87:19]

[87:20] - [89:5]

[89:9] - [91:4]

[91:5] - [91:19]

[91:20] - [94:13]

[94:14] - [95:15]

[95:16] - [96:24]

[96:25] - [97:16]

[97:17] - [99:23]

[99:24] - [100:4]

[100:5] - [100:23]

[101:20] - [103:17]

[103:18] - [104:11]

[104:12] - [106:9]

[106:10] - [107:9]

[107:10] - [108:3]

[108:4] - [108:8]

[108:9] - [109:9]

[109:10] - [109:18]

[109:19] - [110:22]

[110:23] - [111:16]

[111:23] - [112:23]

[112:24] - [113:5]

[113:6]

[113:7]

[113:14] - [113:17]

[113:18] - [113:23]

[113:24] - [114:19]

[114:20] - [114:23]

[114:24] - [115:15]

[115:16] - [115:24]

[115:25] - [117:13]

[117:14] - [118:18]

[118:19] - [121:5]

[121:25] - [122:12]

[122:13] - [123:16]

[123:21] - [125:4]

[125:9] - [127:3]

[127:4] - [127:10]

[127:11] - [128:2]

[128:7] - [128:13]

[128:14] - [129:16]

[129:17] - [130:20]

[130:21] - [131:14]

[131:15] - [132:12]

[132:16] - [135:13]

[135:14] - [136:8]

[136:12] - [136:18]

[136:23] - [137:13]

[137:17] - [139:1]

[139:14] - [141:2]

[141:3] - [142:8]

[142:9] - [142:24]

[143:16] - [144:15]

[144:16] - [145:6]

[146:5] - [147:19]

[147:20] - [148:10]

[149:16] - [150:15]

[150:16] - [151:19]

[151:20] - [152:21]                    [154:19] - [155:17]
[152:22] - [154:18]                    [155:18] - [155:19]

Plaintiff intends to introduce the following testimony of **Bryan Scott** dated February 23, 2005.

McRoberts objects to introduction of this evidence on the basis that the testimony of Mr. Scott

was not a deposition and is inadmissible hearsay.

Page/Line
[32:11] - [32:13]
[39:20] - [40:2]
[40:12] - [40:14]
[42:10] - [43:1]
[46:5] - [46:22]
[47:12] - [47:14]
[47:20] - [48:1]
[48:4] - [48:6]
[49:18] - [50:8]
[51:4] - [51:11]
[51:12] - [52:10]
[56:18] - [57:13]
[63:4] - [65:11]
[74:13] - [75:8]
[75:11] - [75:25]

Plaintiff intends to introduce the following testimony of **H. Mark Perkins** dated October 28,

2004, October 29, 2004, February 9, 2005, and February 10, 2005. McRoberts objects to the

introduction of this evidence on the basis that this is improper since the testimony of Mr.

Perkins is not a deposition and is inadmissible hearsay   Perkins objects to the introduction of

this testimony as improper because it was not a deposition and is therefore inadmissible as

hearsay, and since he will be appearing as a witness.

Page/Line
**10/28/2004**                         [34:4] - [34:14]
[17:25] - [18:4]                       [41:10] - [42:21]
[18:4] - [18:12]                       [43:20] - [44:4]
[19:1] - [19:6]                        [44:9] - [44:15]
[19:10] - [19:20]                      [46:7] - [46:24]
[20:18] - [21:11]                      [47:7] - [49:8]
[26:18] - [27:15]                      [49:22] - [51:2]
[27:25] - [28:7]                       [52:13] - [52:22]
[28:22] - [29:17]                      [56:3] - [56:18]
[30:15] - [31:1]                       [57:1] - [57:23]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[58:20] - [59:4]
[61:10] - [61:12]
[61:10] - [61:20]
[65:1] - [66:7]
[66:15] - [66:21]
[68:3] - [68:15]
[82:23] - [83:6]
[83:16] - [84:6]
[87:23] - [88:14]
[88:14] - [88:23]
[90:15] - [90:22]
[93:10] - [93:15]
[93:22] - [94:9]
[94:9] - [94:16]
[99:6] - [99:8]
[100:5] - [100:10]
[104:13] - [104:20]
[107:11] - [107:19]
[108:25] - [109:4]
[109:9] - [109:18]
[110:12] - [110:18]
[117:1] - [117:14]
[117:17] - [118:4]
[118:4] - [118:19]
[119:9]
[121:15] - [121:19]
[125:6] - [125:11]
[143:25] - [144:15]
[144:16] - [144:25]
[146:11] - [147:4]
[148:12] - [148:23]
[149:2]
[149:6] - [149:12]
[149:13] - [149:17]
[149:22] - [150:6]
[150:8] - [150:18]
[155:5] - [155:21]
[156:23] - [157:16]
[158:17] - [158:25]
[160:7] - [160:13]
[161:5] - [161:11]
[163:22] - [164:14]
[164:21] - [165:1]
[165:5] - [165:9]
[166:7] - [166:12]
[166:18] - [166:24]

[167:6] - [167:19]
[169:12] - [169:19]
[172:9] - [173:9]
[175:22] - [176:2]
[177:10] - [177:22]
[177:23] - [178:3]
[179:8] - [179:21]
[179:25] - [180:18]
[183:20] - [184:3]
[186:15] - [187:5]
[187:25] - [188:13]
[189:4] - [189:12]
[191:25] - [192:12]
[192:17] - [193:7]
[193:8] - [193:14]
**10/29/2004**
[6:4] - [6:7]
[6:24] - [7:5]
[7:9] - [7:19]
[23:15] - [23:22]
[26:22] - [27:3]
[31:14] - [31:19]
[40:20] - [41:1]
[45:8] - [45:21]
[48:15] - [49:4]
[51:13] - [51:21]
[51:13] - [51:21]
[51:22] - [52:16]
[56:7] - [56:15]
[58:23] - [59:4]
[60:24] - [61:6]
[69:22] - [70:7]
[73:6] - [73:15]
[76:18] - [77:5]
[77:14] - [77:18]
[78:1] - [78:10]
[79:4] - [79:9]
[80:12] - [80:22]
[87:24] - [88:6]
[90:11] - [90:16]
[91:2] - [91:9]
[91:10] - [91:21]
[93:3] - [93:6]
[94:13]
[95:9] - [95:15]
[96:4] - [96:12]

[100:14] - [100:23]
[101:6] - [101:10]
[102:5] - [102:7]
[102:23] - [104:9]
[106:23] - [107:8]
[107:9] - [107:16]
[111:5] - [111:9]
[113:19] - [113:25]
**2/9/2005**
[15:5] - [16:20]
[23:17] - [24:10]
[24:19] - [24:22]
[25:16] - [26:17]
[28:18] - [29:4]
[29:5] - [29:19]
[30:3] - [30:6]
[31:10] - [32:10]
[32:11] - [33:4]
[35:12] - [35:16]
[35:17] - [36:10]
[36:21] - [37:10]
[39:23] - [40:9]
[42:5] - [44:16]
[44:19] - [46:7]
[46:20] - [48:15]
[48:24] - [49:7]
[49:8] - [49:24]
[49:25] - [50:7]
[50:19] - [51:6]
[51:14] - [52:6]
[53:11] - [54:11]
[54:20] - [54:25]
[55:1] - [55:13]
[55:23] - [56:18]
[57:9] - [57:20]
[62:24] - [63:14]

[64:14] - [64:25]
[66:3] - [66:9]
[67:7] - [67:11]
[68:11] - [68:17]
[68:22] - [69:4]
[72:10] - [72:21]
**2/10/2005**
[14:13] - [15:10]
[17:10] - [18:9]
[19:25] - [20:5]
[22:20] - [23:9]
[26:13] - [27:4]
[27:13] - [27:20]
[28:12] - [28:20]
[29:6] - [29:12]
[29:24] - [30:1]
[30:21] - [31:11]
[32:2] - [32:13]
[36:11] - [37:8]
[37:9] - [37:17]
[47:6] - [47:12]
[47:21] - [48:11]
[57:19] - [58:4]
[58:22] - [59:3]
[64:19] - [65:10]
[67:3] - [68:3]
[70:9] - [70:21]
[70:21] - [71:4]
[73:17] - [74:7]
[75:17] - [76:8]
[76:9] - [78:2]
[78:10] - [79:10]
[82:18] - [82:23]
[83:14] - [84:12]
[85:17] - [88:17]

Plaintiff intends to introduce the following testimony of **D. Scott Elliott** dated May 11,

2005.  McRoberts objects to the introduction of this evidence on the basis that this is

improper since the testimony of Mr. Elliott is not a deposition and is inadmissible

hearsay

Page/Line

[14:1] - [14:3]
[15:1] - [15:3]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[16:2] - [16:3]
[16:11] - [16:13]
[16:22] - [16:24]
[18:5] - [18:10]
[18:21] - [19:13]
[19:20] - [19:23]
[23:4] - [24:2]
[24:16] - [25:6]
[26:25] - [28:13]
[28:14] - [28:24]
[29:13] - [29:16]
[29:17] - [31: 9]
[31:20] - [32:9]
[32:23] - [34:2]
[34:3] - [34:6]
[34:7] - [34:18]
[34:19] - [35:2]
[35:11] - [36:18]
[36:18] - [36:21]
[37:8] - [38:6]
[38:13] - [38:15]
[38:16] - [39:3]
[39:13] - [39:17]
[40:3] - [40:19]
[41:3] - [41:8]
[41:17] - [41:24]
[42:18] - [46:19]
[47:2] - [47:18]
[49:2] - [50:12]
[50:13] - [50:25]
[51:5] - [52:3]
[52:8] - [52:20]
[53:9] - [54:2]
[54:3] - [54:9]
[54:11] - [54:15]
[58:14] - [60:16]
[60:20] - [62:24]
[62:25] - [64:24]
[65:25] - [66:19]
[66:25] - [67:11]
[67:12] - [67:17]
[67:19] - [68: 5]
[68:6] - [69:19]
[72:25] - [74:21]
[75:11] - [75:16]
[76:25] - [77:6]

[77:17] - [78:1]
[78:24] - [81:6]
[81:8] - [82:16]
[84:8] - [84:22]
[85:12] - [86:7]
[88:7] - [89:8]
[89:17] - [90:6]
[90:22] - [91:22]
[93:16] - [94:1]
[94:6] - [95:6]
[96:20] - [96:23]
[97:18] - [97:24]
[98:6]
[98:15] - [98:22]
[101:1] - [102:19]
[103:17] - [104:19]
[105:21] - [106:8]
[106:9] - [107:13]
[107:18] - [108:11]
[108:18] - [109:5]
[110:6] - [110:14]
[111:11] - [112:13]
[113:13] - [114:24]
[119:10] - [121:4]
[121:21] - [122:13]
[123:14] - [124:6]
[126:5] - [126:18]
[127:3] - [127:15]
[129:9] - [130:20]
[131:19] - [132:13]
[132:14] - [132:24]
[133:17] - [133:25]
[134:21] - [135:1]
[137:8] - [137:14]
[140:15] - [141:12]
[142:4] - [143:5]
[143:11] - [144:3]
[144:25] - [145:6]
[145:24] - [146:3]
[146:10] - [147:7]
[147:11] - [147:13]
[147:23] - [149:6]
[149:25] - [150:13]
[151:8] - [152:22]
[153:12] - [153:16]
[157:1] - [157:13]

[161:1] - [161:11]
[162:9] - [162:17]

Defendant Mc Roberts intends to introduce the following deposition testimony:

1.     Dennis Brovarone (August 21, 2007):  pp. 13:l-14:2; pp. 15:21-16:2; pp. 17:20-18:10; pp. 25:3-26:3; pp. 38:14-39:9; pp. 45:12-46:8; p. 53:21-25; p. 58:4-20; p. 62:9-23; p. 65:1-4; p. 65:6-15; pp. 71:20-72:11; p. 75:12-25; p. 90:9-16; p. 91:17-92:1; p. 92:3-7; p. 94:11-95:3; p. 95:24-96:6; p. 97:7-12; p. 97:19-98:7; p. 98:20-99:18; p. 100:3-12; p. 100:16-101:3; p. 101:18-102:8; p. 104:8-11; p. 104:12-17; p. 106:25-108:2; p. 108:6-13; p. 109:9-19.

Plaintiff objects to McRoberts' designations for Brovarone at p. 58:4-20 as incomplete by not including the question and answer that begins at p. 57:25-58:6 and including irrelevant material on taking a break; p. 71:20-72:3 which includes the video technician comment about the recess; p. 90:9-16 as incomplete and irrelevant; p. 91:17-92:1 and 92:3-7 objection information on Mr. Bogani's businesses is irrelevant; p. 94:11-95:3, Brovarone's prior provision of legal services to Bogani and playing poker is irrelevant; p. 97:19-98:7, 98:20-99:18 Brovarone's concerns about whether sale was improper are irrelevant, he was not acting as the attorney for McRoberts and did not advise him, nor has McRoberts asserted a reliance on counsel defense or identified Mr. Brovarone as an expert; p. 100:3-12, p. 100:16-101:3, p. 101:18-102:8 Brovarone's knowledge of how long Firestone held the securities, his failure to inquire, and reliance on representation about being non-affiliates is irrelevant to McRoberts violation;  p. 104:8-17 are the statements of McRoberts attorney and are not evidence; p 106:25-107:9, Brovarone's use of a similar from for Spencer Edwards is irrelevant.

2.     Paul Enright (August 21, 2007):  p. 7:19-8:2; p. 8:13-16; pp. 10:19-11:6; p. 15:1-5; p. 15:14-22; pp. 17:13-18:3; pp. 22:22-23:6; pp. 24:15-25; p. 31:20-22; p. 33:13-24; p. 34:11-14; pp. 37:24-38:9; p. 40:5-14; p. 42:15-18; pp. 44:9-45:1; pp. 45:9-46:7; pp. 55:18-56:1; p. 60:2-12; p. 62:10-20; pp. 63:20-64:3; p. 84:13-24; p. 85:16-25; p. 87:9-17; pp. 87:18-88:12; pp. 88:22-89:3; p. 90:19-21; p. 91:2-17; p. 93:5-13; pp. 94:24-95:10; p. 96:7-10; p. 96:23-25; p. 97:1-14; p. 97:15-24; p. 98:2-8; p. 99:12-14; p. 100:4-17; p. 102:16-18; p. 105:23-24.

Plaintiff objects to McRoberts' designations for Enright at p. 8:13-18 as irrelevant; p. 31:20-22 as incomplete, it should include p. 31:21-25; p. 33:13-24 as incomplete, it should include p. 33:10-23; p. 34:11-14 as incomplete, it should include p. 34:10-12; p. 84:13-24 should include the answer at 84:25; p. 87:9-16 objection unanswered question; p. 88:22-89:3 testimony on block transactions lacks foundation; p. 90:19-21, 91:2-11 speculation, lack of foundation ; p. 93:5-13, incomplete should include 93:3-13; p. 99:12-14, incomplete should include 99:9-14; p. 100:4-17 incomplete should include p. 100:1-17; and p. 102:16-18 irrelevant.

   3.  Mark Bogani (September 5, 2007):  p. 7:3-14; p. 8:1-7; p. 9:9-21; p. 11:6-13; pp. 12:21-13:4; p. 13:12-17; p. 15:1-18; p. 18:18-22; p. 19:9-18; pp. 19:19-20:14; pp. 26:23-27:6; pp. 36:9-37:2; p. 40:9-23; p. 41:7-17; p. 44:3-9; p. 44:14-22; pp. 44:23-45:5; p. 46:3-9; pp. 46:24-47:12; p. 47:13-20.

Plaintiff objects to McRoberts' designations for Mr. Bogani  at p. 36:9-37:2, objection irrelevant, Bogani's knowledge of the registration requirements, work with a brokerage firm and knowledge of Brovarone are irrelevant to whether McRoberts violated the registration provisions; p. 40:9-23, 46:24-47:12 objection irrelevant, Mr. Bogani's status an accredited investor is irrelevant; p. 41:7-17 irrelevant; and p. 44:3-9, 46:3-9, objection irrelevant Bogani's form and reliance on Brovarone is irrelevant.

Each party herby acknowledges by signing this **joint** Proposed Final Pretrial Order that any deposition not listed as provided herein will not be allowed absent good cause."

   H.  MOTIONS IN LIMINE (JURY TRIAL)

Motions in limine shall be filed as separate pleadings and responded to in accordance with the instructions contained in the Order Setting Final Pretrial Conference.

   I.  LIST OF PENDING MOTIONS

None.  However, the SEC would like to present its exhibits and deposition video clips by means of a computer that will televise the images onto computer screens for the jury, witness, opposing counsel and the Court.

   J.  ESTIMATED LENGTH OF TRIAL

3 hours – Jury selection

5   hours – Opening Statements (plaintiff 2 hours)

80 hours – Plaintiff's case (including rebuttal, if any)

       Mr. McRoberts believes the estimate for Plaintiff's case is unreasonably long, and will not leave any time for Mr. McRoberts to present a case.  Defendants, iBiz, Schilling and Perkins object to this estimate, the August 29, 2006 Joint Proposed Case Management Plan estimated the total length of the trial at 10 days.  These Defendants ask that the Court place time limits on the presentations of the parties at trial.

8 hours – Defendant McRoberts' case.

8 hours – Defendants iBiz, Schilling and Perkins case

8 hours – Defendant Elliott's case

8   hours – Closing arguments (SEC 2 hours, McRoberts 1 hour, Elliott 1 hour)

120 hours – Total.

K.     PROPOSED TRIAL DATES

February 24, through March 20, 2009

L.     JURY DEMAND

The defendants, iBiz Technology Corporation, Kenneth Schilling, Mark Perkins, jointly and Scott Elliott and Jerrold McRoberts separately, demanded a jury trial in their answers filed on June 12, 13 and November 20, 2006 respectively.  The parties stipulate that the request was timely and properly made.

M.     JOINT PROPOSED JURY INSTRUCTIONS, JOINT PROPOSED VOIR DIRE QUESTIONS, AND PROPOSED FORMS OF VERDICT

The separately filed **joint** Proposed Jury Instructions, **joint** Proposed Voir Dire Questions, and Proposed Forms of Verdict are incorporated by reference into this **joint** Proposed Final Pretrial Order.

N.     CERTIFICATIONS

The undersigned counsels for each of the parties in this action do hereby certify and acknowledge the following:

1.      All discovery has been completed.

2.      The identity of each witness has been disclosed to opposing counsel.

3.      Each exhibit listed herein: (1) is in existence; (2) is numbered; and (3) has been disclosed and shown to opposing counsel.

4.      The parties have complied **in all respects** with the mandates of the Court's Rule 16 Scheduling Order and Order Setting Final Pretrial Conference.

5.      The parties have made all of the disclosures required by the Federal Rules of Civil Procedure.

6.      The parties acknowledge that once this **joint** Proposed Final Pretrial Order has been signed and lodged by the parties, no amendments to this Order can be made without leave of Court.

APPROVED AS TO FORM AND CONTENT:


s/ Leslie J. Hughes_____
Leslie J. Hughes
Attorney for the Plaintiff


s/ David A. Zisser_____
David A. Zisser
Attorney for Defendant
Jerrold McRoberts

s/  Thomas D. Birge_____
Thomas D. Birge
Attorney for Defendant
Doyle Scott Elliott


s/ John E. Karow_____
John E. Karow
Attorney for Defendants
iBiz Technology Corporation
Kenneth Schilling
S Mark Perkins

1    Based on the foregoing,

2    IT IS ORDERED that this Proposed Final Pretrial Order jointly submitted by the parties is

3    hereby APPROVED and ADOPTED as the official Pretrial Order of this Court.

4    Dated this 23rd day of February, 2009.

James A. Teilborg
United States District Judge